UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ESOTERIX GENETIC LABORATORIES LLC, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 14-cv-13228-ADB |
| | * | |
| QIAGEN INC. and QIAGEN MANCHESTER, LTD., | * | |
| | * | |
| | * | |
| Defendants. | * | |

## MEMORANDUM AND ORDER

September 25, 2015

BURROUGHS, D.J.

### I.   INTRODUCTION

Plaintiff Esoterix Genetic Laboratories LLC ("Esoterix") brings this action against

Defendants Qiagen Inc. and Qiagen Manchester, LTD. (collectively, "Qiagen"), alleging that

Qiagen has exceeded the scope of a license agreement and thereby infringed upon Esoterix's

patent rights. Esoterix's Amended Complaint [ECF No. 7 ("Compl.")], alleges claims for patent

infringement (Count I); violation of Massachusetts General Laws Ch. 93A (Count II); breach of

contract (Count III); and breach of the duty of good faith and fair dealing (Count IV).

Before the Court is Qiagen's Motion to Dismiss the Amended Complaint pursuant to

Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief may be

granted. [ECF No. 26.] Qiagen argues that the patent-in-suit, U.S. Patent No. 7,294,468, is

invalid because it purports to cover an unpatentable "law of nature" and that, as a result,

Esoterix's patent infringement claim is not viable, and all of Esoterix's state-law claims must

also be dismissed. For the reasons discussed in this Memorandum and Order, Qiagen's Motion to Dismiss is allowed in part and denied in part.

## II.    FACTS ALLEGED IN THE COMPLAINT

Esoterix is the assignee of U.S. Patent No. 7,294,468 (the "'468 Patent"), titled "Method to Determine Responsiveness of Cancer to Epidermal Growth Factor Receptor Targeting Treatments." See '468 Patent; Compl. ¶¶ 21-24.[1] The '468 Patent claims a method for determining whether particular types of pharmaceutical drugs are likely to be effective in treating non-small cell lung cancer in a patient, based on the presence or absence of certain nucleotide variances in the patient's gene. More specifically, the inventors discovered that there is a positive correlation between the existence of particular naturally-occurring nucleotide variations on a person's epidermal growth factor receptor ("EGFR") gene, and the likelihood that specific pharmaceutical compounds (namely, gefitinib or erlotinib) will be effective in treating non-small lung cancers in that person. See '468 Patent, 519:44-520:49. The patent application was filed on December 4, 2005, and the U.S. Patent Office issued the '468 Patent on November 13, 2007.

Previously, all right, title, and interest in the '468 Patent was owned by non-party Genzyme Corporation ("Genzyme"). In 2008, Genzyme entered into a License Agreement (the "License Agreement") with non-party DxS, Ltd. ("DxS"). The License Agreement granted DxS a non-exclusive license to manufacture and sell certain products utilizing the '468 Patent, in exchange for royalty payments, among other terms and conditions. Compl. ¶¶ 18, 25-32. In or

---

[1] Although the '468 Patent is not physically attached to Esoterix's Complaint, the Court takes judicial notice of its contents, as the patent is specifically referenced in Esoterix's Complaint, and it is a matter of public record. See Hoganas AB v. Dresser Indus., Inc., 9 F.3d 948, 954 n.27 (Fed. Cir. 1993) (citing Fed. R. Evid. 201(b)(2)). A copy of the '468 Patent is attached as Exhibits A and B to Qiagen's Memorandum in Support of its Motion to Dismiss. [ECF Nos. 27-1, 27-2.]

around September 2009, DxS was acquired by a Qiagen entity, and Qiagen therefore assumed DxS's rights and obligations as licensee under the License Agreement. Id. ¶ 20. In December 2010, Genzyme sold certain assets (including all its rights to the '468 Patent, as well as its rights as licensor under the License Agreement) to Laboratory Corporation of America Holdings ("LabCorp"). Id. ¶¶ 2, 21. LabCorp, in turn, created Esoterix as a wholly-owned subsidiary, to control the purchased assets, and Esoterix now holds all right, title, and interest in the '468 Patent, and claims to be the successor-in-interest to Genzyme under the License Agreement. Id. ¶¶ 23-24.

The gravamen of Esoterix's claims in this case is that Qiagen exceeded the scope of the license, and breached certain promises made in the License Agreement. Notably, the License Agreement only allowed Qiagen to sell certain types of products at certain times, and it drew a key distinction between "Licensed Products" and "Licensed Research Products." Id. ¶¶ 26-29. Licensed Products included diagnostic kits (for determining the presence of EGFR mutations) that would be marketed and sold for commercial use. Id. ¶ 27. Licensed Research Products were limited to diagnostic kits that would be sold for non-commercial, research use only. Id. ¶¶ 28-29. Under the terms of the License Agreement, Qiagen could only sell Licensed Research Products for non-commercial use until regulatory approval was obtained for commercial use. Id. ¶ 30. Regulatory approval for the test kits was not obtained until July 2013. Id. ¶ 37. Esoterix concedes that prior to regulatory approval and during the term of the License Agreement, Qiagen paid Esoterix royalties for its sales of Licensed Research Products. Id. ¶¶ 34-35. Esoterix, however, alleges that a substantial number of those sales were impermissibly made for commercial use, rather than solely for research purposes, as required by the License Agreement and the non-exclusive patent rights it granted to Qiagen. Id. ¶¶ 36, 38.

3

In Count I of the Amended Complaint, Esoterix alleges that when Qiagen offered for sale and sold those test kits for uses other than those authorized by the License Agreement, Qiagen infringed the claims in Esoterix's '468 Patent. Id. ¶¶ 45-54. Esoterix further alleges that Qiagen's actions induced patent infringement and contributed to infringement by others. Id. ¶¶ 55-56. In Count II, Esoterix alleges that Qiagen acted in bad faith by offering test kits for commercial use prior to regulatory approval, and thereby violated Massachusetts General Laws Ch. 93A. Id. ¶¶ 59-70. Count III sets forth a claim for breach of contract, alleging that Qiagen breached the terms of the License Agreement. Id. ¶¶ 73-77. In Count IV, Esoterix alleges that Qiagen also breached the duty of good faith and fair dealing that arose under the License Agreement. Id. ¶¶ 79-89. Esoterix claims that it has suffered damages as a result of Qiagen's actions, see id. ¶¶ 57-58, 71-72, 78, 90-91, and it seeks compensatory damages, plus certain statutory enhancements, as well as costs and attorneys' fees.

## III.    THE '468 PATENT

The '468 Patent claims a method for "determining an increased likelihood of pharmacological effectiveness of treatment by gefitinib or erlotinib in an individual diagnosed with non-small lung cancer . . . ." '468 Patent 519:43-48. The significance of this invention is explained in the patent's specification. Epithelial cell cancers, which include non-small cell lung cancers, are diseases characterized by abnormal, accelerated growth of epithelial cells. Id. 1:43-47. Epidermal growth factor receptor ("EGFR"), a protein expressed on the surface of those epithelial cells, is the product of a growth-promoting oncogene (erbB or ErbB1). Id. 2:3-17.  This oncogene is believed to play a pivotal role in the development of epithelial cell cancers. Id. 2:16-18. Thus, scientists have explored inhibiting EGFR as a method of treating such cancers. One area of exploration involves EGFR tyrosine kinase inhibitors. Id. 2:58-3:14. Two of the more

advanced compounds in clinical development in this area include gefitinib (developed by

AstraZeneca UK Ltd), and erlotinib (developed by Genetech, Inc. and OSI Pharmaceuticals). Id.

3:15-22.  The use of the drugs is limited, however, because patients can develop a resistance to

their therapeutic effects, and some patients simply do not respond to these drugs at all. As noted

in the patent, tyrosine kinase inhibitor therapies, such as gefitinib, are not effective for the "vast

majority" of non-small lung cancer patients. Id. 3:57-59.

The key discovery made by the inventors of the '468 Patent is that the presence of certain

mutations in the kinase domain of a patient's EGFR gene substantially increases the sensitivity

of EGFR to tyrosine kinase inhibitor therapy. Id. 3:59-63. By determining whether or not a

patient has such mutations in his or her EGFR, a doctor or scientist can predict the likelihood that

the patient will respond to tyrosine kinase inhibitor therapies like gefitinib and erlotinib. Id. 4:5-

8. The abstract of the '468 Patent describes the invention as a "method for determining the

responsiveness of cancer to an epidermal growth factor receptor (EGFR) treatment." Noting that

"the presence of at least one variance in the kinase domain of the erbB1 gene confers sensitivity

to the tyrosine kinase inhibitor gefitinib," the abstract explains that a "diagnostic assay" – i.e., a

test – for these mutations will allow doctors to administer gefitinib, erlotinib and other inhibitors

to those patients most likely to respond to the drugs.

Accordingly, Claim 1, the only independent claim in the patent, claims

> [a] method for determining an increased likelihood of
> pharmacological effectiveness of treatment by gefitinib or erlotinib
> in an individual diagnosed with non-small cell lung cancer
> comprising:
>
> Obtaining DNA from a non-small cell lung cancer tumor sample
> from the individual; and determining the presence or absence of at
> least one nucleotide variance in exon 18, 19, or 21 of the epidermal
> growth factor receptor (EGFR) gene in the DNA, wherein the
> presence of at least one nucleotide variance selected from:

1) An in-frame deletion in exon 19 of the EGFR gene consisting of a deletion within codons 746 to 753 that results in amino acid changes comprising a deletion of at least amino acids leucine, arginine, and glutamic acid at position 747, 748, and 749 of SEQ ID NO:512;

2) A substitution in exon 21 that results in an amino acid change consisting of a substitution of arginine for leucine at position 858 (L858R) of SEQ ID NO:512, or a substitution in exon 21 that results in an amino acid change consisting of a substitution of glutamine for leucine at position 861 (L861Q) of SEQ ID NO:512; or

3) A substitution in exon 18 that results in an amino acid change consisting of a substitution of cysteine for glycine at position 719 (G719C) of SEQ ID NO:512

indicates an increased likelihood of pharmacological effectiveness of treatment by gefitinib or erlotinib in the individual.

Id. 519:44–520:49.

The remaining claims in the patent (Claims 2-8) are all dependent claims incorporating the method of Claim 1, in which the "determining" step is carried out by specified detection methods (Claims 2-5), or the nucleotide variance is limited to a specified variance (Claims 6-8). Id. 520:50-522:5.

## IV.   PROCEDURAL HISTORY

Esoterix filed its Complaint on August 5, 2014, and an Amended Complaint on August 14, 2014. [ECF No. 7.] On October 31, 2014, Qiagen filed its Motion to Dismiss all of Esoterix's claims, arguing that the '468 Patent is invalid because it purports to patent "laws of nature," which are not patentable subject matter under Section 101 of the Patent Act. [ECF No. 27.] Qiagen further argues that because the Patent is invalid, all of Esoterix's accompanying state law claims must also be dismissed. Id. Esoterix filed an Opposition to Qiagen's Motion to Dismiss on November 25, 2014, [ECF No. 36], and Qiagen filed a Reply on December 15, 2014. [ECF No. 39.] Esoterix filed a Sur-Reply on January 15, 2015, [ECF No. 44], and Qiagen filed a Sur-

Response on January 23, 2015. [ECF No. 47.] On July 6, 2015, Qiagen filed a Notice of

Supplemental Authority, alerting the Court to the Federal Circuit's decision in <u>Ariosa</u>

<u>Diagnostics, Inc. v. Sequenom, Inc.</u>, 788 F.3d 1371 (2015). [ECF No. 62.] Esoterix filed a

Response to this Notice on July 9, 2015. [ECF No. 63.]  The parties appeared before the Court

for a hearing on Qiagen's Motion to Dismiss on July 13, 2015. [ECF No. 65.][2]

## V.    LEGAL STANDARD, RIPENESS, AND BURDENS OF PROOF

To survive a motion to dismiss, a plaintiff must "state a claim that is plausible on its

face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678

(2009). In this case, however, the critical issue is not whether Esoterix's Amended Complaint

alleges facts sufficient to make out plausible claim for patent infringement. Rather, the key

question is whether it is sufficiently clear—at this early stage of the proceedings—that Esoterix's

patent claims fail as a matter of law because the '468 Patent covers ineligible subject matter, and

is therefore invalid.  In other words, Qiagen's Motion to Dismiss has raised an affirmative

defense of invalidity. The First Circuit has acknowledged that "[w]hile most Rule 12(b)(6)

motions are premised on a plaintiff's putative failure to state an actionable claim, such a motion

may sometimes be premised on the inevitable success of an affirmative defense." <u>Nisselson v.</u>

<u>Lernout</u>, 469 F.3d 143, 150 (1st Cir. 2006). It is appropriate to allow a Rule 12(b)(6) motion on

---

[2] This matter was originally assigned to Judge Sorokin in August 2014, who referred the case to
Magistrate Judge Bowler. [ECF No. 4.] In February 2015, the matter was randomly reassigned to
my docket. [ECF No. 49.] In March 2015, during a hearing on the Motion to Dismiss, Magistrate
Judge Bowler determined that she needed to recuse herself. [ECF No. 54.] I elected not to refer
the Motion to an alternative magistrate judge and scheduled a hearing on the Motion. [ECF No.
64.]

the basis of an affirmative defense if: "(i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude." Id. (quoting Rodi v. S. New Engl. Sch. Of Law, 389 F.3d 5, 12 (1st Cir. 2004)).

Esoterix, however, contends that it would be inappropriate to adjudicate the issue of invalidity at the motion-to-dismiss stage, and it argues that the Court must engage in claim construction before ruling on whether the '468 Patent covers eligible subject matter. "Whether a claim is drawn to patent-eligible subject matter under § 101 is an issue of law . . . ." In re Bilski, 545 F.3d 943, 951 (Fed. Cir. 2008). "Although the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter, claim construction is not an inviolable prerequisite to a validity determination under § 101." Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n, 776 F.3d 1343, 1349 (Fed. Cir. 2014); see also Cyberfone Sys., LLC v. CNN Interactive Grp., Inc., 558 F. App'x 988, 992 n.1 (Fed. Cir. 2014) ("There is no requirement that the district court engage in claim construction before deciding § 101 eligibility.") (citing Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.), 687 F.3d 1266, 1273 (Fed. Cir. 2012)).  Although "there may be cases in which the legal question as to patentable subject matter may turn on subsidiary factual issues," In re Comiskey, 554 F.3d 967, 975 (Fed. Cir. 2009), Esoterix has not identified any relevant factual or claim construction issues that would preclude the Court from deciding whether the '468 Patent covers eligible subject matter at this stage of the proceedings.[3]

---

[3] In fact, most of the "claim construction" issues identified by Esoterix in its Opposition, [ECF No. 36, at 12], are not claim construction issues at all. To the extent that Esoterix proposes particular constructions of terms in the '468 Patent, the Court, as it must, adopts those constructions for purposes of deciding Qiagen's Motion to Dismiss.

The parties also appear to disagree about the legal standard applicable to Qiagen's Motion to Dismiss. Esoterix contends that Qiagen must prove that the '468 Patent does not cover patentable subject matter by "clear and convincing" evidence. [ECF No. 36, at 4 (citing Microsoft Corp. v. i4i Ltd. P'ship, 131 S. Ct. 2238, 2245 (2011)).] The clear and convincing standard derives from Section 282 of the Patent Act, which provides that patents issued by the United States Patent and Trademark Office are entitled to a "presumption of validity" when faced with an invalidity challenge from an alleged infringer. See Microsoft Corp., 131 S. Ct. at 2245. As a result, a party attacking the validity of a patent must generally prove invalidity by clear and convincing evidence. See id. Qiagen, however, points out that the law is unsettled as to whether the presumption of validity, and, in turn, the "clear and convincing" standard, applies when the issue is one of Section 101 validity. See Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709, 720 (Fed. Cir. 2014) (Mayer, J., concurring) (concluding that although "a presumption of validity attaches in many contexts, no equivalent presumption of eligibility applies in the section 101 calculus") (citation omitted). Lower courts appear to be divided on this issue, see Affinity Labs of Texas, LLC v. DirecTV, LLC, No. 6:15-CV-0030-WSS-JCM, 2015 WL 3764356, at *16 & n.6 (W.D. Tex. July 7, 2015) (collecting cases), and there is no binding precedent from the Federal Circuit.[4]

---

[4] In 2013, the Federal Circuit stated in Ultramercial, Inc. v. Hulu, LLC, 722 F.3d 1335, 1339 (Fed. Cir. 2013) ("Ultramercial I") that in order to grant a Rule 12(b)(6) motion on the grounds of ineligible subject matter, "the only plausible reading of the patent must be that there is clear and convincing evidence of ineligibility." 722 F.3d at 1339. The Supreme Court, however, subsequently vacated the decision in Ultramercial I and remanded the case for further consideration in light of the Supreme Court's ruling in Alice Corp. Pty. v. CLS Bank Int'l, 134 S. Ct. 2347 (2014). See WildTangent, Inc. v. Ultramercial, LLC, 134 S. Ct. 2870 (2014) (granting petition for writ of certiorari, and remanding case to Federal Circuit). Thus, the opinion issued in Ultramercial I no longer has precedential effect. See Genetic Techs. Ltd. v. Bristol-Myers Squibb Co., 72 F. Supp. 3d 521, 527 (D. Del. 2014) (citing Los Angeles Cnty. v. Davis, 440 U.S. 625, 634 n.6 (1979)). Furthermore, after the case was remanded, and the Federal Circuit reconsidered

The Court, however, need not resolve this question, because the debate over the appropriate burden of proof appears to be purely academic in the context of this case. As noted above, Esoterix has not convincingly identified any factual discovery as necessary to resolve the patentability issue. Furthermore, Qiagen's Motion to Dismiss does not seek to establish any facts that would be subject to proof by clear and convincing evidence. See Microsoft Corp., 131 S. Ct. at 2253 (Breyer, J., concurring) (noting that the "clear and convincing" standard is an "evidentiary standard of proof" that "applies to questions of fact and not to questions of law"). Rather, Qiagen argues that the '468 Patent is invalid because it covers ineligible subject matter, and that this can be resolved based on a straightforward application of Section 101 case law to the claims of the '468 Patent. See Modern Telecom Sys. LLC v. Earthlink, Inc., No. SA CV 14-0347-DOC, 2015 WL 1239992, at *7 (C.D. Cal. Mar. 17, 2015) ("Because, ordinarily, no evidence outside the pleadings is considered in resolving a motion to dismiss or a motion for judgment on the pleadings, it makes little sense to apply a 'clear and convincing evidence' standard [to] . . . such motions.") Thus, the patentability issue is a question of law, and the Court will assume all facts alleged by Esoterix to be true, and construe the patent claims in the light most favorable to Esoterix. See Content Extraction & Transmission LLC, 776 F.3d at 1349 (holding that district court properly resolved defendant's motion to dismiss at the pleadings

---

the validity issue in light of Alice, the Federal Circuit affirmed the district court's ruling that the patent was directed to ineligible subject matter, and held that the patent claims were properly dismissed for failure to state a claim. Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709, 716-17 (Fed. Cir. 2014) ("Ultramercial II"), cert. denied sub nom. Ultramercial, LLC v. WildTangent, Inc., 135 S. Ct. 2907 (2015). Notably, the Federal Circuit's opinion on remand made no mention of any presumption of validity attaching in a case under Section 101; nor did it mention a clear and convincing evidence standard. But, in a concurring opinion, Judge Mayer opined that "no presumption of eligibility should attach when assessing whether claims meet the demands of section 101." Ultramercial II, 772 F.3d at 720 (Fed. Cir. 2014) (Mayer, J., concurring). Therefore, it is unclear,  if there is a  presumption of validity or if the clear and convincing evidence standard applies in Section 101 challenges.

stage, where it was clear that the patent claims were directed to ineligible subject matter, even when construed in a light most favorable to the patentee).

## VI.   DISCUSSION

### A.  The Patent Claims (Count I)

#### 1. Patentability Under 35 U.S.C. § 101 – The <u>Mayo</u> and <u>Alice</u> Test

The general standard for patentability is found in Section 101 of the Patent Act, which provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." 35 U.S.C. § 101. The United States Supreme Court, however, has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." <u>Alice Corp. Pty. v. CLS Bank Int'l</u>, 134 S. Ct. 2347, 2354 (2014) (internal quotations and citation omitted). "Phenomena of nature, though just discovered . . . are not patentable, as they are the basic tools of scientific and technological work." <u>Mayo Collaborative Servs. v. Prometheus Labs., Inc.</u>, 132 S. Ct. 1289, 1293 (2012) (quoting <u>Gottschalk v. Benson</u>, 409 U.S. 63, 67 (1972)). Because "monopolization of these tools through the grant of a patent might tend to impede innovation more than it would tend to promote it," <u>Mayo Collaborative Servs.</u>, 132 S. Ct. at 1293, the discovery of natural phenomena is generally not amenable to patent protection. <u>See</u> <u>id.</u>

The Supreme Court has also cautioned, however, against "too broad an interpretation of this exclusionary principle." <u>Id.</u> If taken to extremes, the "law of nature" principle has the potential to "eviscerate patent law," as "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature." <u>Id.</u> Often, the line separating the patentable from the unpatentable is very thin. While a "scientific truth" may not be a patentable invention, "an <u>application</u> of a law

of nature . . . to a known structure or process may well be deserving of patent protection." Id. at

1293-94. But "to transform an unpatentable law of nature into a patent-eligible application of

such a law, one must do more than simply state the law of nature while adding the words 'apply

it.'" Id. at 1294.

The Supreme Court's recent decisions in Mayo Collaborative Services v. Prometheus

Laboratories, Inc., 132 S.Ct. 1289 (2012) and Alice Corp. Pty. Ltd. v. CLS Bank International,

134 S.Ct. 2347 (2014) establish a two-part test to determine whether patent claims cover eligible

subject matter. "First, we determine whether the claims at issue are directed to one of those

patent-ineligible concepts [that include the laws of nature, natural phenomena, and abstract

ideas]." Alice Corp., 134 S.Ct. at 2355. "If so, we then ask, '[w]hat else is there in the claims

before us?' To answer that question, we consider the elements of each claim both individually

and 'as an ordered combination' to determine whether the additional elements 'transform the

nature of the claim' into a patent-eligible application." Id. (quoting Mayo Collaborative Servs.,

132 S.Ct. at 1296-97). When conducting the second part of this analysis, the court is searching

for an "inventive concept," i.e., "an element or combination of elements that is 'sufficient to

ensure that the patent in practice amounts to significantly more than a patent upon the ineligible

concept itself.'" Id. (alterations adopted).

The Supreme Court's application of this two-part analysis in Mayo is instructive, as the

patent claims in Mayo bear some similarities to the claims in the '468 Patent. Like the claims in

this case, the claims in Mayo were method claims. They asserted patent claims on

> [a] method of optimizing therapeutic efficacy for treatment of an
> immune-mediated gastrointestinal disorder, comprising:
>
> (a) administering a drug providing 6-thioguanine to a subject having
>     said immune-mediated gastrointestinal disorder; and
> (b) determining the level of 6-thioguanine in said subject, . . .

> wherein the level of 6-thioguanine less than about 230 pmol per 8x108 red blood cells indicates a need to increase the amount of said drug subsequently administered to said subject and
>
> wherein the level of 6-thioguanine greater than about 400 pmol per 8x108 red blood cells indicates a need to decrease the amount of said drug subsequently administered to said subject.

132 S.Ct. at 1295.

In <u>Mayo</u>, the Court held that these claims set forth "laws of nature"—specifically, "relationships between concentrations of certain metabolites in the blood and the likelihood that a dosage of thiopurine drug will prove ineffective or cause harm." <u>Id.</u> at 1296. This relationship, the Court noted, "is a consequence of the ways in which thiopurine compounds are metabolized by the body—entirely natural processes." <u>Id.</u> at 1297. The Court concluded that where the claims "simply describes that relation," the claims were directed to a natural law. <u>Id.</u>

Next, the Court tested whether the claims did "significantly more than simply describe these natural relations,"—more precisely, whether the claims "add <u>enough</u> to their statements of the [natural] correlations to allow the processes they describe to qualify as patent-eligible processes that <u>apply</u> natural laws?" <u>Id.</u> Specifically, the Court analyzed the "administering," "determining," and "wherein" steps in the patent claims to determine whether they were sufficient to "transform the nature of the claim" from a law of nature into a novel invention worthy of patent protection. <u>Id.</u>

In <u>Mayo</u>, the Court first found that, considered individually, none of these steps (administering, determining, wherein) added anything transformative to the basic law of nature recited in the claim. The Court noted that "the 'wherein' clauses simply tell a doctor about the relevant natural laws, at most adding a suggestion that he should take those laws into account when treating his patient." <u>Id.</u> Further, the "determining" step instructed the doctor to measure the metabolite levels in the blood, "through whatever process the doctor or the laboratory wishes

to use." Id. In fact, the Mayo patents themselves admitted that methods for determining

metabolite levels were already well-known in the art. Id. at 1297-98. "Purely conventional or

obvious pre-solution activity is normally not sufficient to transform an unpatentable law of

nature into a patent-eligible application of such a law." Id. at 1298 (citing Parker v. Flook, 437

U.S. 584, 590 (1978)). Similarly, the "administering" clause did not add anything inventive to

the claims; it simply referred to the relevant audience (doctors), who had been using thiopurine

drugs "to treat patients suffering from autoimmune disorders long before anyone asserted these

claims." Id. at 1297. Thus, none of the additional steps, considered individually, added any

innovation worthy of patent protection to the basic law of nature that was recited in the claims.

See id.

Second, the Mayo Court considered whether the combination of these three steps into a

discrete process added anything novel to the law of nature recited in the claims. The Court found

that nothing about the combination of these three steps added anything to the law of nature "that

is not already present when the steps are considered separately." Id. at 1298. In sum, "the claims

inform a relevant audience about certain laws of nature; any additional steps consist of well-

understood, routine, conventional activity already engaged in by the scientific community; and

those steps, when viewed as a whole, add nothing significant beyond the sum of their parts." Id.

The Court ultimately concluded that because the Mayo patents "effectively claim the underlying

laws of nature themselves," and were not sufficiently transformative to warrant patent protection,

the patent claims were drawn to ineligible subject matter, and were therefore invalid. Id. at 1305.

## 2. Application of **Alice** and **Mayo** to the '468 Patent

The Court agrees with Qiagen that, under the two-part test set forth in Alice, the claims of

the '468 Patent, much like the Mayo patents, are ineligible for patent protection. First, Claim 1 of

the '468 Patent is directed to a law of nature, in that it describes the correlation between a naturally-occurring mutation in a cancer cell, and the likelihood that a particular type of known pharmaceutical compound will be effective in treating that type of cancer. The '468 Patent concedes that the use of EGFR tyrosine kinase inhibitors like erlotinib and gefitinib as a treatment for epithelial cancers was already well-known in the art at the time of the '468 Patent application. '468 Patent 2:58-3:35. The inventors of the '468 Patent did not invent a new treatment for such cancers, or fundamentally alter an existing treatment. Rather, they discovered why a known treatment was more effective in treating some patients than in others. Although the discovery is significant, the correlation between the naturally-occurring gene mutation they identified, and the effectiveness of a known treatment method, is a "natural process," and an "eternal truth that exists in principal apart from any human action." PerkinElmer, Inc. v. Intema Ltd., 496 Fed. App'x 65, 70 (Fed. Cir. 2012). Therefore, Claim 1 is directed to a law of nature.

Second, the Court finds nothing "transformative" in the method of Claim 1 that amounts to a novel application of the natural law, or that otherwise warrants patent protection. See Alice Corp., 134 S.Ct. at 2354-55. Individually, none of the steps comprising the method in Claim 1 is novel or transformative. First, the "obtaining" step of "[o]btaining DNA from a non-small cell lung cancer tumor sample from the individual[,]" 468 Patent 519:49-50, is not inventive. See '468 Patent 14:20-24 ("Nucleic acid molecules can be isolated from a particular biological sample using any number of procedures which are well-known in the art . . . .") Similarly, the "determining" step relies upon known methods of detecting genetic mutations. See Id. 14:32-44 ("Determining the presence or absence of a particular variance or plurality of variances in the kinase domain of the erbB1 gene in a patient can be performed in a variety of ways."), 15:24-33 ("Methods for diagnostic tests are well known in the art and disclosed in patent application WO

00/04194, incorporated herein by reference."). Finally, the "wherein" step simply recites the natural law in question—that the presence of at least one identified genetic variance set forth in Claim 1 "indicates an increased likelihood of pharmacological effectiveness of treatment by gefitinib or erlotinib in the individual." Id. 519:53-520:49.

Esoterix argues that together, these steps comprise a method that is novel and transformative, because "[t]he correlation between these particular nucleotide variances and gefitinib and erlotinib was not previously known or understood, and thus, it was not routine or conventional to administer these drugs when those nucleotide variances were present." [ECF No. 36, at 9.] Esoterix nonetheless concedes that conventional treatment for epithelial cancers already included EGFR tyrosine kinase inhibitors such as gefitinib and erlotinib. [Id. at 4]; see also '468 Patent 2:58-3:35.  Therefore, Esoterix, in essence, is claiming that it was not previously conventional to administer these drugs only to patients with these particular genetic mutations. Because the correlation identified by Esoterix was not previously known, the drugs were, instead, prescribed more indiscriminately. Thus, the method claimed in the '468 Patent does not fundamentally transform, or even alter, a known method of treating these cancers. Rather, it identifies a law of nature that explains why such treatment is more effective in a certain population of patients, and tells scientists and doctors that they can "apply" that law of nature by testing for the relevant gene mutations using methods well-known in the art. Although the additional steps are "not themselves natural laws," "neither are they sufficient to transform the nature of the claim." Mayo, 132 S.Ct. at 1297. Consequently, the Court finds that, much like the claims analyzed in Mayo, Claim 1 of the '468 Patent is directed to ineligible subject matter, and

is therefore invalid.[5] See also Ariosa Diagnostics, Inc. v. Sequenom, Inc., 788 F.3d 1371 (Fed. Cir. 2015) (Federal Circuit in invalidating a patent directed to a natural phenomenon held that, "appending routine, conventional steps to a natural phenomenon, specified at a high level of generality, is not enough to supply an inventive concept");  Assoc. for Molecular Pathology v. Myriad Genetics, Inc., 689 F.3d 1303, 1334 (Fed. Cir. 2012) (holding that claims "comparing" or "analyzing" two gene sequences to determine variances were unpatentable because they claimed only "abstract mental processes" of comparing two genetic sequences to determine if the two "are the same or different, wherein the later indicates an alteration . . . ."); PerkinElmer v. Intema, Fed. App'x 65, 66-73 (Fed. Cir. 2012) (finding that a method of measuring levels of certain biomarkers from pregnancy to determine whether there was an increased risk of Down's syndrome was unpatentable, because the relationship between the bio-markers and the risk of Down's syndrome is "a natural process, an eternal truth," and the steps of "measuring" the markers or "determining" the increased risk were methods stated as "known" in the patent's specification); Genetic Techs. Ltd. v. Laboratory Corp. of Am. Holdings, No. 12–1736–LPS–CJB, 2014 WL 4379587, at *10 (D. Del. Sept. 3, 2014) (holding that a method of analyzing a human sample to detect the presence of certain genetic variations, and linking that variation with a resulting physical condition, was an unpatentable natural law).

This holding also extends to each of the dependent claims in Claims 2-8. A dependent claim necessarily includes all limitations from the independent claim upon which it relies, see 35 U.S.C. § 112(d), and the dependent claims in the '468 Patent do not purport to add any further

---

[5] In so holding, the Court does not mean to minimize the importance of the inventors' discovery. But, "[g]roundbreaking, innovative, or even brilliant discovery does not by itself satisfy the § 101 inquiry." Ass'n for Molecular Pathology v. Myriad Genetics, Inc., 133 S.Ct. 2107, 2117 (2013).

limitations that would qualify independently for patent protection. Claims 2, 3, 4, and 5 claim the method of Claim 1, wherein the presence or absence of the identified mutations are determined by "DNA sequencing" (Claim 2); "allele-specific amplification" (Claim 3); "single strand conformation polymorphism, denaturing gradient gel electrophoresis or temperature gradient gel electrophoresis analysis" (Claim 4); and "mismatch cleavage analysis." (Claim 5). See '468 Patent 520:50-63. The '468 Patent, in fact, concedes that each of these methods was well-known in the art, and Esoterix does not now argue otherwise. See '468 Patent, 14:32-43 (noting that tests for determining the presence of variances are "commonly performed" and "can be performed by a variety of methods"); 23:63-67 (noting that nucleic acid sequencing "can be carried out by various methods recognized by those skilled in the art"); 18:56-65 (describing allele specific amplification and citing sources ); 18:12-17 (describing use of single strand conformation polymorphism and citing sources); 17:39-49 (describing the "art technique" of mismatch cleavage analysis). Therefore, Claims 2-5 are also directed to ineligible subject matter. Similarly, Claims 6, 7, and 8 claim the method of Claim 1, wherein the nucleotide variance is limited to a specific mutation. Again, there is nothing inventive added by these limitations, and therefore, Claims 6-8 are also directed to ineligible subject matter.

In light of this conclusion, the Court need not address Qiagen's alternative argument that Esoterix's claims for indirect infringement should be dismissed for failure to plead facts sufficient to make out a plausible claim for relief. [ECF No. 27, at 15-17.] In the absence of any valid patent claims, all of Esoterix's patent infringement claims in Count I of the Amended Complaint are hereby DISMISSED.

### B.  The State-Law Claims (Counts II – IV)

Qiagen next argues that if Esoterix's patent claims are invalid, Esoterix's accompanying state-law claims for breach of contract, violation of M.G.L. c. 93A, and breach of the covenant of good faith and fair dealing must be dismissed as well. The premise of Qiagen's argument, however, is that Esoterix's claim for breach of contract is entirely coextensive with Esoterix's patent infringement claim. According to Qiagen, the only difference between the patent and contract claims is that in Count III, Esoterix is "enforcing Qiagen's promise not to infringe the patent," rather than enforcing the patent itself. Qiagen argues that where the underlying patent has been invalidated, the corresponding "promise not to infringe" is unenforceable in a breach of contract action. [ECF No. 27, at 17.]

To support this argument, Qiagen relies on a line of cases beginning with Lear, Inc. v. Adkins, 395 U.S. 653 (1969), in which the Supreme Court abolished the rule of licensee estoppel. Before Lear was decided, a licensee could be estopped from arguing that the patent was invalid, as a defense in a suit for unpaid royalties. See Lear, 395 U.S. at 656 (citing Automatic Radio Mfg. Co. v. Hazeltine Research, 339 U.S. 827, 836 (1950)). In Lear, the Supreme Court explained that the doctrine of licensee estoppel was the result of applying "ordinary contract principles" to a patent licensing agreement. Typically, by "accepting a license and paying royalties," the licensee "receives certain benefits." Id. at 669. As examples, the licensee has "avoided the necessity of defending an expensive infringement action," and the "existence of an unchallenged patent may deter others from attempting to compete with the licensee." Id. The Court acknowledged that under contract law, "the mere fact that some benefit is received is enough to require the enforcement of the contract, regardless of the validity of the underlying patent." Id. Nonetheless, the Court held that in patent cases, this principle of contract law must yield to federal patent policy, which would be frustrated if licensees were prevented from

challenging a patent's validity. See id. at 670-71. The Court pointed out that licensees "may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery." Id. at 670. "If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification." Id. Therefore, in Lear, the Supreme Court held that a licensee is not estopped from challenging the validity of a patent, because the "technical requirements of contract doctrine must give way" to federal patent policy. Id. at 670-71.

Lear, however, does not hold that a licensee is retroactively absolved of all contractual liability if the underlying patent is invalidated. In fact, it is well-established that a licensor may pursue a licensee for breach of contract, notwithstanding the invalidity of an underlying patent. For example, in Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co., 112 F.3d 1561 (Fed. Cir. 1997), the Federal Circuit held that a licensee remains liable for unpaid royalties under a license agreement, up until the date that the licensee first challenges the validity of the claims. 112 F.3d at 1567-68. In Shell Oil, a patent holder and licensor brought claims against a licensee for (1) unpaid royalties under a license agreement, and (2) patent infringement. After finding that several of the patent claims were invalid, the district court held that the licensor could, nonetheless, recover damages for breach of the license agreement, "where the validity of the underlying patent was not challenged until after the breach occurred." Id. at 1563. The district court also certified a question to the Federal Circuit, namely, whether the subsequent invalidation of the patent would affect the licensor's claims for unpaid royalties for the period before the licensee challenged the validity of the patent. Id. at 1563-64. The Federal Circuit held that it would not. In so holding, the court noted that "contract law governs the enforcement of the license," and "[n]othing in [the] license made payment of royalties contingent upon the validity

of [the patent-in-suit]." Id. at 1567. The Federal Circuit, consistent with Lear, acknowledged that

principles of state contract law may be overridden when federal patent policies would be

"significantly frustrated" by enforcing a licensing agreement, but found "no significant

frustration of federal patent policy by enforcing the [license agreement], to the extent of allowing

[the licensor] to recover royalties until the date [licensee] first challenged the validity of the

claims." Id. at 1568 (citing Diamond Scientific Co. v. Ambico, Inc., 848 F.2d 1220 (Fed. Cir.

1988)). The court reasoned that the licensee derived significant benefits from the licensing

agreement—namely, insulation from competition and protection against infringement

accusations. Id. Accordingly, permitting the licensee to "exploit the protection of the contract

and patent rights and then later to abandon conveniently its obligations under those same rights"

would be manifestly unjust. Id. Thus, the Federal Circuit held that a licensee cannot invoke the

protection of the Lear doctrine until it "(i) actually ceases payment of royalties, and (ii) provides

notice to the licensor that the reason for ceasing payment of royalties is because it has deemed

the relevant claims to be invalid." Id.; see also Wang Labs., Inc. v. OKI Elec. Indus. Co., Ltd., 15

F. Supp. 2d 166, 180 (D. Mass, 1998) (royalties are due under a patent licensing agreement until

the licensee gives notice that it is challenging the validity of the patents); Am. Sterilizer Co. v.

Sybron Corp., 614 F.2d 890, 896 (3d Cir. 1980) ("Hence, despite the patent's invalidity,

[plaintiff] had a contract claim against [its licensee] enforceable until the initiation of the

lawsuit" challenging the validity of the patent); Advocent Redmond Corp. v. Raritan Americas,

Inc., No. 10-cv-6100 PKC, 2012 WL 3114855, at *12 (S.D.N.Y. July 31, 2012) ("invalidity of

the asserted patents will not absolve [a licensee] of any liability it has for breach of contract"

prior to its challenge to the validity of the patents).

Qiagen argues that <u>Shell Oil</u> and its progeny are distinguishable because they relate to the licensor's right to recover <u>royalties</u> due, and here, Esoterix does not seek unpaid royalties. Even assuming that no royalties are sought, the Court is not persuaded that there is a relevant distinction between unpaid royalties and other types of damages flowing from the breach of the Licensing Agreement. The Federal Circuit's holding in <u>Shell Oil</u> is not obviously limited to royalties and can be read to stand for the broader principle that a licensee may not avoid liability for *damages* arising out of its breach of a license agreement, assuming that the breach occurred prior to the date that the licensee first challenged the validity of the patent claims. <u>See</u> 112 F.3d at 1568. Consistent with <u>Shell Oil</u>, to the extent that Qiagen owes Esoterix any additional payments for its unauthorized sales, those royalties may be recoverable under a breach of contract theory, up until the point when Qiagen formally challenged the patent's validity. Further, to the extent that Qiagen's breach caused Esoterix to incur any other type of damages, Esoterix may also pursue such damages under a breach of contract theory. The invalidity of the patent does not, as Qiagen contends, automatically foreclose Esoterix's breach of contract claim. <u>See</u> <u>Hoffman-La Roche, Inc. v. Promega Corp.</u>, 319 F.Supp.2d 1011, 1027-28 (N.D. Cal. 2004) (rejecting defendant's argument that patent's invalidity warranted dismissal of all contract claims).

Furthermore, Qiagen's reliance on the Ninth Circuit's 1971 decision in <u>Massillon-Cleveland-Akron Sign Co. v. Golden State Advert. Co.</u>, 444 F.2d 425 (9th Cir. 1971), is misplaced. In <u>Massillon</u>, the parties had previously settled a patent infringement dispute. In the relevant settlement agreement, the alleged infringers expressly acknowledged the validity of the patent, covenanted not to contest the patent's validity, and further agreed that they would not infringe the patent in the future. 444 F.2d at 425. After the settlement agreement was executed,

however, the patent holder learned that the alleged infringers were, once again, infringing on the

patent. The patent holder brought suit against the infringers and other third parties, alleging that

they had breached the settlement agreement by infringing the patent, and that the third parties

had induced this breach. The Ninth Circuit, relying on Lear, held that the covenant not to

challenge the validity of the patent was unenforceable as contrary to federal patent policy. The

court went on, however, to hold that, in the absence of a valid patent, the patent holder was also

precluded from pursuing the defendants under a breach of contract theory, because "a valid

patent is a prerequisite to recovery for inducing the breach of a contract not to infringe, as well as

a prerequisite to recovery for the breach itself." Id. at 428.

　　　The Court finds that the holding in Massillon is inapposite to the facts presented in this

case. In Massillon, the court was not faced with an alleged breach of a licensing agreement. The

only promise that was breached was an express and specific covenant not to infringe on the

patent claims. Further, this promise had been extracted through a settlement agreement.

Therefore, it was clear that the sole factual premise for the breach of contract claim alleged in

Massillon was the patent infringement itself. Here, in contrast, Esoterix alleges that Qiagen

breached a Licensing Agreement—a comprehensive agreement setting forth a variety of rights,

obligations, and terms and conditions governing an ongoing commercial relationship. Qiagen

allegedly breached the Licensing Agreement by, inter alia, offering and selling Licensed

Products for commercial use prior to regulatory approval. Particularly in the context of a

licensing relationship, it is easy to see how breaching such a promise potentially gives rise to a

free-standing contract claim, regardless of whether or not such a breach would also support a

claim for patent infringement. Thus, unlike Massillon, the two claims for relief do not

necessarily rise or fall together. To hold otherwise would be to ignore the rationale and holding

in Shell Oil, and permit licensees to "exploit the protection of the contract and patent rights and then later to abandon conveniently its obligation under those same rights." 112 F.3d at 1568.

Thus, the Court finds that Esoterix has pled a plausible claim for breach of contract, notwithstanding the ineligibility of the patent claims. Following discovery, the parties can address the issue of what damages are recoverable for the alleged breach. See RCA Corp. v. Data Gen. Corp., 887 F.2d 1056, 1064 (Fed. Cir. 1989) (noting that Lear does not "dictate what must be held a breach of contract, or what damages must be awarded for a breach, or under what circumstances, if any, a licensee can recover royalties paid. Those questions . . . [are] dependent on particular fact situations, contract provisions and state contract law, albeit they must be resolved in harmony with general principles discernible from Lear"), overruled on other grounds, as recognized in Linear Tech. Corp. v. Micrel, Inc., 275 F.3d 1040, 1048 (Fed. Cir. 2001). Accordingly, Qiagen's Motion to Dismiss is DENIED as to Count III of the Amended Complaint.

Esoterix also has claims for breach of the covenant of good faith and fair dealing (Count IV) and violation of Massachusetts General Laws Ch. 93A (Count II), which Qiagen has moved to dismiss. Because the Court has held that the parties' contractual duties and liabilities may survive the patent's invalidity, and the implied covenant of good faith and fair dealing is "as broad as the contract that governs the particular relationship," Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 683 (Mass. 2005), Esoterix's good faith and fair dealing claim is still viable. Qiagen's Motion to Dismiss is DENIED as to Count III of the Amended Complaint.

Similarly, Qiagen has asserted no valid grounds for dismissing Esoterix's Chapter 93A claim. Massachusetts General Laws Ch. 93A is a statute that creates "broad new rights, forbidding conduct not previously unlawful under the common law of contract and tort or under

any prior statute." <u>Linkage Corp. v. Trustees of Boston Univ.</u>, 425 Mass. 1, 27 (1997) (internal quotations and citation omitted). Notably, "[a] determination that conduct is unfair or deceptive is not dependent on traditional tort or contract theories." <u>Id.</u> Here, Esoterix has alleged sufficient facts to make out a plausible claim that Qiagen's conduct amounted to unfair or deceptive trade practices, and that Esoterix was injured as a result. Consequently, Qiagen's Motion to Dismiss Count II of the Amended Complaint is <u>DENIED</u>.

## VII.    CONCLUSION

For the foregoing reasons, Qiagen's Motion to Dismiss the Amended Complaint [ECF No. 26] is hereby <u>ALLOWED</u> as to Count I, and <u>DENIED</u> as to all other Counts of the Amended Complaint.

**SO ORDERED.**

Dated: September 25, 2015

<u>/s/ Allison D. Burroughs</u>
ALLISON D. BURROUGHS
DISTRICT JUDGE