**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ESOTERIX GENETIC LABORATORIES LLC,<br><br>Plaintiff,<br><br>v.<br><br>QIAGEN INC. and QIAGEN MANCHESTER, LTD.,<br><br>Defendants. | CASE No. 14-CV-13228-ADB |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR JUDGMENT ON THE PLEADINGS**

Peter E. Ball (BBO #546031)
Ryan M. Cunningham (BBO #661440)
SALLY & FITCH LLP
Tel. (617) 542-5542
Fax. (617) 542-1542
peb@sally-fitch.com
rmc@sally-fitch.com

Robert R. Baron (Admitted pro hac vice)
Marc S. Segal (Admitted pro hac vice)
Tyler R. Marandola (Admitted pro hac vice)
BALLARD SPAHR LLP
Tel. (215) 665-8500
Fax (215) 864-8999
baron@ballardspahr.com
segalm@ballardspahr.com
marandolat@ballardspahr.com

*Attorneys for QIAGEN Inc. and QIAGEN Manchester, Ltd.*

Dated: January 13, 2016

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... i

INTRODUCTION ................................................................................................................ 1

ARGUMENT ....................................................................................................................... 3

I. STANDARD OF REVIEW ............................................................................................ 3

II. THE REMAINING LICENSED PATENTS ARE INELIGIBLE FOR PATENT PROTECTION ............................................................................................ 5

A. The ’349, ’769, and ’916 Patents Are Ineligible for Patent Protection ........... 5

1. The ’349, ’769, and ’916 Patents Are Directed to a Natural Law ........ 5

2. The ’349, ’769, and ’916 Patents Do Not Contain an Inventive Concept Sufficient to Support Patent Protection ................................. 6

B. The ’036 Patent Also Is Ineligible for Patent Protection................................ 8

1. The ’036 Patent Is Directed To a Natural Law .................................... 8

2. The ’036 Patent Does Not Contain an Inventive Concept................. 10

CONCLUSION.................................................................................................................. 11

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alice Corp. Pty. Ltd. v. CLS Bank International*,
134 S.Ct. 2347 (2014)....................5

*Ass'n for Molecular Pathology v. U.S. Patent & Trademark Office*,
689 F.3d 1303 (Fed. Cir. 2012)....................8

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co.*,
771 F. Supp. 2d 1054 (E.D. Mo. 2011)....................9

*Bancorp Servs., LLC v. Sun Life Assurance Co.*,
687 F.3d 1266 (Fed. Cir. 2012)....................9

*Christianson v. Colt Indus. Operating Corp.*,
486 U.S. 800 (1988)....................4

*CLS Bank Int'l v. Alice Corp. Pty.*,
717 F.3d 1269 (Fed. Cir. 2013)....................9

*CyberFone Sys., LLC v. Lexmark Int'l, Inc.*,
--- F. Supp. 3d ---, 2015 WL 5906859 (D. Del. 2015)....................4

*Ellis v. United States*,
313 F.3d 636 (1st Cir. 2002)....................4

*Exergen Corp. v. Kaz USA, Inc.*,
No. 13-10628, 2015 WL 8082402 (D. Mass. Dec. 7, 2015)....................4, 9

*Marrero-Gutierrez v. Molina*,
491 F.3d 1 (1st Cir. 2007)....................3

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
132 S.Ct. 1289 (2012)....................5, 6, 11

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007)....................12

*Morsa v. Facebook, Inc.*,
77 F. Supp. 3d 1007 (C.D. Cal. 2014)....................4

*Ormco Corp. v. Align Tech., Inc.*,
498 F.3d 1307 (Fed. Cir. 2007)....................4

*PerkinElmer, Inc. v. Intema Ltd.*,
496 Fed. Appx. 65 (Fed. Cir. 2012)....................8

*R.G. Fin. Corp. v. Vergara-Nunez*,
446 F.3d 178 (1st Cir. 2006)....................3

*Tavares de Almeida v. Children's Museum*,
28 F. Supp. 2d 682 (D. Mass. 1998)....................3

**FEDERAL STATUTES**

35 U.S.C. § 101.................... passim

**RULES**

Fed. R. Civ. P. 12....................3

Defendants QIAGEN Manchester, Ltd. and QIAGEN Inc. (collectively "QIAGEN") move for a judgment on the pleadings on Counts II-V of its Counterclaims that U.S. Patent Nos. 7,964,349 ("the '349 patent"), 8,105,769 ("the '769 patent"), 8,465,916 ("the '916 patent"), and 9,035,036 ("the '036 patent") (collectively, with U.S. Patent No. 7,294,468 ("the '468 patent"), the "Licensed Patents") are ineligible for patent protection under 35 U.S.C. § 101, as set forth herein.

**INTRODUCTION**

QIAGEN's requested relief flows directly from the Court's September 25, 2015 Memorandum and Order. In that Order, the Court dismissed EGL's claim for infringement of the '468 patent because the'468 patent is "directed to ineligible subject matter, and is therefore invalid." (Dkt. 69, at 16-17.) Based on the same reasoning articulated by the Court in that Order, QIAGEN seeks a judgment that the remaining Licensed Patents are also invalid as directed to ineligible subject matter. QIAGEN's requested relief will simplify this case by eliminating the need for a *Markman* hearing and patent-related discovery, and permit the Court to adjudicate more efficiently the contractual rights between the parties.

By way of a 2008 License Agreement (the "License"), EGL avers that it licensed certain "Patent Rights" to QIAGEN, including the '468 patent and International Patent Application No. PCT/US2005/010645 ("the PCT application"). (Dkt. at ¶¶ 18, 25.) The remaining Licensed Patents fall within those Patent Rights as they all descend from (i.e., claim priority to) the '468 patent and the PCT application.

The Licensed Patents share virtually identical specifications. Each describes their inventions as methods for determining the effectiveness of certain drugs by detecting the presence of certain genetic mutations. Indeed, each contains an identical statement summarizing what the applicants viewed as their invention:

> Accordingly, the present invention provides a novel method to determine the likelihood of effectiveness of an epidermal growth factor receptor (EGFR) targeting treatment in a human patient affected with cancer. The method comprises detecting the presence or absence of at least one nucleic acid variance in the kinase domain of the erbB1 gene of said patient relative to the wildtype erbB1 gene. The presence of at least one variance indicates that the EGFR targeting treatment is likely to be effective.

('468 Patent, Ex. A, col. 4, ll. 5-13; '349 Patent, Ex. B, col. 4, ll. 4-12; '769 Patent, Ex. C, col. 4, ll. 4-12; '916 Patent, Ex. D, col. 4, ll. 4-12.; '036 Patent, Ex. E, col. 4, ll. 4-12.)

Like the invalid '468 patent, the '349, '769, and '916 patents directly claim this method, albeit using slightly broader or narrower (though equally ineligible) language than the '468 patent. For example, the '349 patent's method is directed to individuals with "lung cancer" rather than the '468 patent's limitation to "non-small cell lung cancer." ('349 Patent, Ex. B, Claim 1.) The '769 patent limits the "determining" step to a particular and common detection method referenced in the '468 patent, called a polymerase chain reaction, rather than all determination methods. ('769 Patent, Ex. C, Claim 1.) And, the '916 patent broadens the method to all "EGFR tyrosine kinase inhibitors" rather than the specific inhibitors "gefitinib or erlotinib." ('916 Patent, Ex. D, Claim 1.)

In its prior Order, the Court found that the '468 patent's method claims are "directed to a law of nature in that it describes the correlation between a naturally-occurring mutation in a cancer cell, and the likelihood that a particular type of known pharmaceutical compound will be effective in treating that type of cancer." (Dkt. 69, at 15.) The Court further found nothing "transformative" in the '468 patent's method claims "that amounts to a novel application of the natural law, or that otherwise warrants patent protection." (*Id.*) Thus, given the similarity of the method claims of the '349, '769, and '916 patents to the claims of the '468 patent, the Court's decision applies with equal force to the '349, '769, and '916 patents, as the law of the case.

For the same reasons, the ’036 patent is also patent ineligible. The ’036 patent claims “a kit for practicing the methods of the invention,” (’036 Patent, Ex. E, 32:16-17), and as such is directed to the same natural law as the ’468 patent. Specifically, the ’036 patent explains that the kits are used to detect mutations that “will allow for the administration of gefitinib, erlotinib and other tyrosine kinase inhibitors to those patients most likely to respond to the drug.” (’036 Patent, Ex. E, cover page.) Thus, the Court’s statement in its September 25 Order that the “key discovery made by the inventors of the ’468 Patent is that the presence of certain mutations in the kinase domain of a patient’s EGFR gene substantially increases the sensitivity of EGFR to tyrosine kinase inhibitor therapy” applies equally to the ’036 patent. (Dkt. 69, at 5.) Because the ’036 patent claims do not contain any “transformative” elements that would amount to a novel application of the natural law, the ’036 patent, like the ’468 patent, does not warrant patent protection.

## ARGUMENT

### I. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings after the pleadings are closed, but early enough so as not to delay trial. Fed. R. Civ. P. 12(c). The standard for reviewing a Rule 12(c) motion is the same as the standard for reviewing a Rule 12(b)(6) motion to dismiss. *Marrero-Gutierrez v. Molina*, 491 F.3d 1, 5 (1st Cir. 2007). The Court should view the facts in the pleadings in the light most favorable to the non-moving party, and may supplement the pleadings “by considering documents fairly incorporated therein and facts susceptible to judicial notice.” *R.G. Fin. Corp. v. Vergara-Nunez*, 446 F.3d 178, 182 (1st Cir. 2006). Judgment on the pleadings is designed as a means of disposing cases where there are no material facts in dispute and the moving party is entitled to relief as a matter of law. *Tavares de Almeida v. Children’s Museum*, 28 F. Supp. 2d 682, 685 (D. Mass. 1998). A motion

for judgment on the pleadings can resolve cases at an early stage of litigation, and are frequently the vehicle for determining the legal issue of whether a patent claims ineligible subject matter. *E.g.*, *CyberFone Sys., LLC v. Lexmark Int'l, Inc.*, --- F. Supp. 3d ---, 2015 WL 5906859 (D. Del. 2015); *Morsa v. Facebook, Inc.*, 77 F. Supp. 3d 1007 (C.D. Cal. 2014). Indeed, the Court has already considered and rejected EGL's argument that patent eligibility should not be decided at the pleading stage, and there is no reason to depart from that ruling here. (Dkt. 69, at 8.)

The law of the case doctrine also applies to this motion. This principle "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988). Thus, as applicable here, the law of the case doctrine "means that a court ordinarily ought to respect its own rulings, made earlier in the same case." *Ellis v. United States*, 313 F.3d 636, 646 (1st Cir. 2002). Here, as set forth in detail *infra*, the Court's September 25, 2015 Memorandum and Order established the law of the case regarding the invalidity under Section 101 of not just the '468 patent, but also the '349, '769, and '916 patents, because the differences between those patents and the '468 patent are patentably immaterial and do not alter the question of invalidity. *See Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1319-20 (Fed. Cir. 2007) (holding decision on validity in earlier appeal binding on later appellate panel as law of the case, and applying earlier ruling to invalidate additional claims in different patents that did not contain "patentably significant" differences); *Exergen Corp. v. Kaz USA, Inc.*, No. 13-10628, 2015 WL 8082402, at *2 (D. Mass. Dec. 7, 2015) (Stearns, J.) (applying related doctrine of issue preclusion to invalidate claims in different but related patents where differences between the adjudicated and unadjudicated patent claims did "not materially alter the question of invalidity").

## II. THE REMAINING LICENSED PATENTS ARE INELIGIBLE FOR PATENT PROTECTION

The Court is already familiar with the controlling legal framework for assessing whether a patent is claims an ineligible natural law, such as the correlation between genetic variances and successful treatment with certain drugs:

> The Supreme Court's recent decisions in Mayo Collaborative Services v. Prometheus Laboratories, Inc., 132 S.Ct. 1289 (2012) and Alice Corp. Pty. Ltd. v. CLS Bank International, 134 S.Ct. 2347 (2014) establish a two-part test to determine whether patent claims cover eligible subject matter. "First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts [that include the laws of nature, natural phenomena, and abstract ideas]." Alice Corp., 134 S.Ct. at 2355. "If so, we then ask, '[w]hat else is there in the claims before us?' To answer that question, we consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." Id. (quoting Mayo Collaborative Servs., 132 S.Ct. at 1296-97). When conducting the second part of this analysis, the court is searching for an "inventive concept," i.e., "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.'" Id. (alterations adopted).

(Dkt. 69, at 11-12.) The two-part *Mayo/Alice* test continues to apply here.

### A. The '349, '769, and '916 Patents Are Ineligible for Patent Protection

The '349, '769, and '916 patents are patentably indistinct from the '468 patent that was the subject of the September 25, 2015 Memorandum and Order. Therefore the law and the rationale of that decision apply with equal force to those patents as well.

#### 1. The '349, '769, and '916 Patents Are Directed to a Natural Law

In assessing the '468 patent, the Court properly held that claim 1 of the '468 patent was "directed to a law of nature, in that it describes the correlation between a naturally-occurring mutation in a cancer cell, and the likelihood that a particular type of known pharmaceutical compound will be effective in treating that type of cancer." (Dkt. 69, at 15.)

The independent claims from the ’349, ’769, and ’916 patents each recite this correlation in their claims as well:

| **’468 Patent** | **’349 Patent** | **’769 Patent** | **’916 Patent** |
|---|---|---|---|
| “wherein the presence of at least one nucleotide variance selected from [certain defined variances] indicates an increased likelihood of pharmacological effectiveness of treatment by getfitinib or erlotinib in the individual.”<br><br>(’468 Patent, Ex. A, Claim 1.) | “wherein the presence of at least one nucleotide variance selected from [certain defined variances] indicates an increased likelihood of pharmacological effectiveness of treatment by getfitinib or erlotinib in the individual.”<br><br>(’349 Patent, Ex. B, Claim 1.) | “wherein the presence of . . . at least one nucleotide variance [selected from certain defined variances] indicates that said individual is likely to respond to treatment with gefitinib or erlotinib.”<br><br>(’769 Patent, Ex. C, Claim 1.) | “wherein the presence of at least one nucleotide variance selected from [certain defined variances] indicates an increased likelihood of pharmacological effectiveness of treatment by an EGFR tyrosine kinase inhibitor in the individual.”<br><br>(’916 Patent, Ex. D., Claims 1, 12.) |

As the Court has already held, these “wherein” steps “simply recite[] the natural law in question.” (Dkt. 69, at 16.) Thus, as to step one of the *Mayo/Alice* test, the claims from the ’349, ’769, and ’916 patents, like the ’468 patent, are all directed to a natural law.

**2. The ’349, ’769, and ’916 Patents Do Not Contain an Inventive Concept Sufficient to Support Patent Protection**

At the second step of the *Mayo/Alice* test, the Court must determine whether the claims contain any additional elements that supply an “inventive concept,” meaning elements that are “sufficient to ensure that the patent in practice amounts to significantly more than a patent on the natural law itself.” *Mayo*, 132 S. Ct. at 1294. With respect to the ’468 patent, the Court correctly determined that the answer was no because each of the additional limitations was “not inventive” and “well-known in the art.” (Dkt. 69, at 15, 18.)

The ’349, ’769, and ’916 patents are no different on this issue. Like the ’468 patent, they do not contain any additional limitations sufficient to supply the claims with an inventive concept. For example, and as demonstrated by the chart attached hereto as Appendix A, claim 1 of the ’349, ’769, and ’916 patents contain no additional inventive limitations. Indeed, the ’349 and ’916 patents do not even contain the (non-inventive) “obtaining” step found in the ’468 patent. And the ’769 patent contains virtually identical limitations to the ’468 patent, but limits the method of “determining” to a polymerase chain reaction. Moreover, the ’349, ’769, and ’916 patents contain virtually identical specifications that each concede the routine and conventional nature of their claims’ limitations.[1] Accordingly, both the law and the rationale of the Court’s September 25 Order confirm that the extra limitations in the ’349, ’769, and ’916 patents are routine and not inventive.

Nor do the dependent claims of the ’349, ’769, and ’916 patents add anything inventive that would transform the claims into a patent-eligible application of the natural law. Many of the dependent claims simply specify methods for determining genetic variances, all of which the Court already determined were routine and conventional methods, well-known in the art at the priority date. (Dkt. 69, at 18.) (*Compare* ’468 Patent, Ex. A, Claims 2-5 *to* ’349 Patent, Ex. B, Claims 27-30 *and* ’916 Patent, Ex. D, Claims 2-5 and 13-16.) Other claims merely specify certain genetic mutations for determination (’349 Patent, Ex. B, Claims 2-26; ’769 Patent, Ex. C,

---

[1] ’349 Patent, Ex. B, 14:10-14 (“Nucleic acid molecules can be isolated from a particular biological sample using any number of procedures, which are well-known in the art, the particular isolation procedure chosen being appropriate for the particular biological sample.”); ’769 Patent, Ex. C, 14:10-14 (same); ’916 Patent, Ex. D, 14:1-5 (same); ’349 Patent, Ex. B, 14:33-36 (“Determining the presence or absence of a particular variance or plurality of variances in the kinase domain of the erbB1 gene in a patient with or at risk for developing cancer can be performed in a variety of ways.”); ’769 Patent, Ex. C, 14:22-25 (same); ’916 Patent, Ex. D, 14:13-16 (same); ’349 Patent, Ex. B, 15:24-26 (“Methods for diagnostic tests are well known in the art and disclosed in patent application WO 00/04194, incorporated herein by reference.”); ’769 Patent, Ex. C, 15:11-13 (same); ’916 Patent, Ex. D, 15:3-5 (same).

Claims 2-4; ’916 Patent, Ex. D, Claims 6-8, 12, 17-18) or expand the claims to reference not just particular inhibitors, but also EGFR tyrosine kinase inhibitors as a class (’916 Patent, Ex. D.). Such limitations add nothing inventive. (Dkt. 69, at 18.)

Finally, dependent claim 31 of the ’349 patent adds nothing to independent claim 1 except to provide that, following determination of genetic variances in lung tumor tissue, testing should be done on a “control sample,” and the control sample should then be “compar[ed]” to “the determined presence or absence in the lung tumor tissue.” Such “claims to ‘comparing’ or ‘analyzing’ two gene sequences fall outside the scope of § 101 because they claim only abstract mental processes.” *Ass’n for Molecular Pathology v. U.S. Patent & Trademark Office*, 689 F.3d 1303, 1334 (Fed. Cir. 2012), *rev’d in part on other grounds*, 133 S. Ct. 2107 (2013); *see also PerkinElmer, Inc. v. Intema Ltd.*, 496 Fed. Appx. 65, 71 (Fed. Cir. 2012) (holding limitation that required “comparing” measured markers with known statistics to be an “ineligible mental step”). Nor is the “identification of particular alterations” to look for in the comparison sufficient to render the claims patent eligible. *Ass’n for Molecular Pathology*, 689 F.3d at 1334. Accordingly, none of the claims of the ’349, ’769, or ’916 patents supplies an inventive concept, and each should be held ineligible for patent protection.

### B. The ’036 Patent Also Is Ineligible for Patent Protection

The claims of the ’036 patent are for a “kit” that can be used for “practicing the methods of the invention.” (’036 Patent, Ex. E, 32:16-17.) As such, it is also patent ineligible.

#### 1. The ’036 Patent Is Directed To a Natural Law

The claims of the ’036 patent are directed to a natural law, in that they are merely a routine means for determining if the natural law applies. Claim 1 is illustrative:

1. A kit comprising:

a. at least one nucleic acid probe designed to detect a nucleotide variance [selected from certain identified nucleotide variances,]

wherein the nucleic acid probe comprises a detectable label;

b. products and reagents required to carry out an annealing reaction; and

c. instructions.

('036 Patent, Ex. E, Claim 1.)[2]

Courts have routinely held that claims to tangible objects that do no more than carry out an unpatentable method are just as ineligible for patent protection as is the method itself. *See, e.g.*, *CLS Bank Int'l v. Alice Corp. Pty.*, 717 F.3d 1269, 1287-91 (Fed. Cir. 2013) (*en banc*) (holding claims to a tangible "computer-readable medium" and "data processing system" were an attempt to claim an unpatentable abstract idea, even though the claim "nominally recite[d] as its subject matter a physical device"), *aff'd* 134 S. Ct. 2347 (2014); *Bancorp Servs., LLC v. Sun Life Assurance Co.*, 687 F.3d 1266, 1276-77 (Fed. Cir. 2012) (affirming holding of ineligibility for tangible media claim where "machines appear to be no more than 'objects[s] on which the method operates.'" (alteration in original) (quoting *Bancorp Servs., L.L.C. v. Sun Life Assurance Co.*, 771 F. Supp. 2d 1054, 1064 (E.D. Mo. 2011)), *cert denied*, 134 S. Ct. 2870 (2014); *Exergen*, 2015 WL 8082402, at *6 (holding ineligible under § 101claims that limited "measuring" and "determining" steps to particular physical objects, because the "recitation of a generic piece of equipment does not materially alter the validity analysis") (internal citations omitted).

While nominally reciting a physical "kit," the '036 patent is directed to a natural law because its purpose is to identify it. As the specification confirms, the overarching purpose of the '036 patent is to "provide[] a novel method to determine the likelihood of effectiveness of an epidermal growth factor receptor . . . targeting treatment in a human patient affected with

[2] Claim 16 of the '036 patent is the only other independent claim. It is identical to claim 1 except that it omits elements (b) and (c), and thus is subject to the same analysis as claim 1.

cancer." ('036 Patent, Ex. E, 4:4-7.) Thus, the method patents, described above, claim a method for determining the applicability of the natural law; the '036 patent claims a kit for "practicing" those methods. ('036 Patent, Ex. E, 32:16-17.)

**2. The '036 Patent Does Not Contain an Inventive Concept**

There is nothing about the "kit" claimed in the '036 patent that transforms it into a patent eligible application of the natural law it embodies. Indeed, each and every item included in the kit is routine and conventional.

As an initial matter, as the specification makes clear, it is routine and conventional for a researcher to create a "nucleic acid probe" that "hybridiz[es]" to a particular mutation once the researcher is told the mutation to identify. ('036 Patent, Ex. E, 18:65-66 ("Those skilled in the art are familiar with the preparation of probes with particular specificities."); 19:29 ("Such hybridization probes are well known in the art."); 21:52-55 ("The presence or absence of variances in the test biological sample may be detected by selective hybridization techniques, known to those of skill in the art and described above.").) Neither is there anything inventive about adding a detectable label to the nucleic acid probe to identify when hybridization has occurred. ('036 Patent, Ex. E, 31:8 ("Suitable assay labels are known in the art . . . ."); 31:24-29 ("A number of exemplary labels are known in the art and all such labels may be employed in connection with the present invention.").) And there is nothing inventive about including in the claimed kit "products and reagents" for carrying out the necessary chemical reaction because, as the patent specification makes clear, the kit contains nothing more than the "usual" reagents necessary to carry out the desired method of determining particular variances. (*Id.* 32:16-49 (describing a kit and reagents).) The Court has already held that such techniques for determining genetic variances are not inventive. (Dkt. 69, at 18.)

Finally, the claimed kit contains "instructions for use of the kit." ('036 Patent, Ex. E, 32:26.) Nothing in the specification suggests that the instructions change the manner in which the kit detects variances, or are otherwise anything beyond a routine and conventional set of directions for applying the natural law. Put simply, there is nothing inventive about claiming a natural law and adding instructions that tell the relevant audience how to "apply it." *Mayo*, 132 S. Ct. at 1294.

When considered as a whole, the additional elements of the claims of the '036 patent offer nothing of substance that the other Licensed Patents – which the Court has essentially ruled ineligible for patent protection – do not. Rather, instead of claiming a method for determining whether a natural law applies, the '036 patent claims a routine and conventional kit for determining whether a natural law applies. The limitations of 35 U.S.C. § 101 cannot be so easily avoided.[3]

**CONCLUSION**

The inventors of all of the patents involved in this litigation made an unpatentable discovery: the correlation between certain naturally occurring genetic variations and the effectiveness of treatment with certain drugs. Apart from that correlation, none of the claims at issue in any of the patents add inventive material sufficient to transform this natural law into a patentable *application* of that law. Thus, in addition to the '468 patent, the other Licensed Patents still in force, are ineligible for patent protection under 35 U.S.C. § 101.

For the foregoing reasons, QIAGEN respectfully requests that the Court grant its motion for judgment on the pleadings, declare the '349, '769, '916, and '036 patents ineligible for patent

[3] Apart from claims 1 and 16, the remaining dependent claims of the '036 patent do nothing more than recite additional naturally occurring mutations that the nucleic acid probe is designed to detect. As the Court has held, specifying additional or particular mutations for detection is not inventive. (Dkt. 69, at 18.)

protection under 35 U.S.C. § 101, and order whatever further relief the Court deems just and proper.[4]

Dated: January 13, 2016

QIAGEN Inc. and QIAGEN Manchester, Ltd.,

By their attorneys,

**Sally & Fitch LLP**

/s/ *Peter E. Ball*
Peter E. Ball (BBO #546031)
Ryan M. Cunningham (BBO #661440)
SALLY & FITCH LLP
Tel. (617) 542-5542
Fax. (617) 542-1542
peb@sally-fitch.com
rmc@sally-fitch.com

Robert R. Baron (Admitted *pro hac vice*)
Marc S. Segal (Admitted *pro hac vice*)
Tyler R. Marandola (Admitted *pro hac vice*)
BALLARD SPAHR LLP
Tel. (215) 665-8500
Fax (215) 864-8999
baron@ballardspahr.com
segalm@ballardspahr.com
marandolat@ballardspahr.com

---

[4] In its Answer, EGL denies that there is an "actual, substantial, and continuing controversy" between EGL and QIAGEN with respect to the validity of the '349, '769, '916, and '036 patents, implying that the Court lacks declaratory judgment jurisdiction. (Dkt. 79, at ¶¶ 43, 48, 53, and 58.) EGL is wrong; indeed, its position ignores binding law from the Supreme Court on this precise issue. In *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), the Court considered whether a patent licensee could challenge the validity of the patent in a declaratory judgment action, notwithstanding that the licensee had not terminated or breached the license (and therefore could not be sued for patent infringement). The Court answered yes, and that is the precise situation that exists here. Indeed, EGL's own pleading acknowledges that Licensed Products and Licensed Research Products are defined as products that among other things "cannot be manufactured, used, offered for sale, or sold, in whole or part without infringing one or more Valid claims under the Patent Rights." (Dkt. 7, at ¶¶ 27-28.) Thus, QIAGEN is only contractually obligated to pay royalties on *valid* patents, and determination of the patents' validity is integral to QIAGEN's counterclaim (Count I) seeking a declaration that it owes no royalties under the License Agreement.

Appendix A

| ’468 Patent | ’349 Patent | ’769 Patent | ’916 Patent |
|---|---|---|---|
| 1. A method for determining an increased likelihood of pharmacological effectiveness of treatment by gefitinib or erlotinib in an individual diagnosed with non-small cell lung cancer comprising:<br>***obtaining*** DNA from a non-small cell lung cancer tumor sample from the individual; and<br>***determining*** the presence or absence of at least one nucleotide variance in exon 18, 19, or 21 of the epidermal growth factor receptor (EGFR) gene in the DNA,<br>***wherein*** the presence of at least one nucleotide variance selected from:<br>[certain nucleotide variances]<br>indicates an increased likelihood of pharmacological effectiveness of treatment by gefitinib or erlotinib in the individual.<br><br>(’468 Patent, Ex. A, Claim 1.) | 1. A method for determining an increased likelihood of pharmacological effectiveness of treatment by gefitinib or erlotinib in an individual diagnosed with lung cancer comprising:<br>***determining*** in lung tumor tissue from the individual the presence or absence of at least one nucleotide variance in exon 18, 19, or 21 of the epidermal growth factor receptor (EGFR) gene,<br>***wherein*** the presence of at least one nucleotide variance selected from:<br>[certain nucleotide variances]<br>indicates an increased likelihood of pharmacological effectiveness of treatment by gefitinib or erlotinib in the individual.<br><br>(’349 Patent, Ex. B, Claim 1.) | 1. A method to determine an increased likelihood of response to treatment with gefitinib or erlotinib in an individual affected with non-small cell lung cancer (NSCLC) comprising:<br>***determining*** by polymerase chain reaction, the presence or absence of at least one nucleotide variance in exon 18, 19, or 21 of the epidermal growth factor receptor (EGFR) gene in the DNA,<br>***obtained*** from an NSCLC sample from said individual, wherein said at least one nucleotide variance is selected from:<br>[certain nucleotide variances]<br>***wherein*** the presence of said at least one nucleotide variance indicates that said individual is likely to respond to treatment with gefitinib or erlotinib.<br><br>(’769 Patent, Ex. C, Claim 1.) | 1. A method for determining an increased likelihood of pharmacological effectiveness of treatment by an EGFR tyrosine kinase inhibitor in an individual diagnosed with non-small cell lung cancer comprising:<br>***determining*** the presence or absence of at least one nucleotide variance in exon 18, 19, or 21 of the epidermal growth factor receptor (EGFR) gene in ~~the~~ DNA from a non-small cell lung cancer tumor sample from the individual,<br>***wherein*** the presence of at least one nucleotide variance selected from:<br>[certain nucleotide variances]<br>indicates an increased likelihood of pharmacological effectiveness of treatment by an EGFR tyrosine kinase inhibitor in the individual.<br><br>(’916 Patent, Ex. D, Claim 1.) |

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing document to be filed through the Court's ECF system and that it will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants on January 13, 2016.

/s/ *Peter E. Ball*
Peter E. Ball