# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ESOTERIX GENETIC LABORATORIES LLC, <br><br> Plaintiff, <br><br> -against- <br><br> QIAGEN N.V., QIAGEN GMBH, QIAGEN NORTH AMERICAN HOLDINGS, INC., QIAGEN INC., and QIAGEN MANCHESTER, LTD., <br><br> Defendants. | CASE NO. 14-cv-13228 |

## PLAINTIFF ESOTERIX GENETIC LABORATORIES LLC'S AND COUNTERCLAIM-DEFENDANT LABORATORY CORPORATION OF AMERICA HOLDINGS' MEMORANDUM OF LAW IN OPPOSITION TO QIAGEN'S MOTION FOR JUDGMENT ON THE PLEADINGS AND IN SUPPORT OF THEIR CROSS-MOTION TO DISMISS QIAGEN'S COUNTERCLAIMS

James M. Campbell (#541882)
jmcampbell@campbell-trial-lawyers.com
Christopher R. Howe (#652445)
chowe@campbell-trial-lawyers.com
**Campbell Campbell Edwards & Conroy**
**Professional Corporation**
One Constitution Plaza
Boston, Massachusetts 02129
Tel: (617) 241-3000
Fax: (617) 241-5115

Robert I. Steiner (*pro hac vice*)
rsteiner@kelleydrye.com
Beth D. Jacob (*pro hac vice*)
bjacob@kelleydrye.com
Clifford Katz (*pro hac vice*)
ckatz@kelleydrye.com
**Kelley Drye & Warren LLP**
101 Park Avenue
New York, New York 10178
Tel: (212) 808-7800
Fax: (212) 808-7897

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS.......................................................................................................1

A.  The Covenant Not to Sue..........................................................................................2

B.  The Patents at Issues.................................................................................................3

ARGUMENT..........................................................................................................................4

I.   THE COURT LACKS SUBJECT MATTER JURISDICTION OVER QIAGEN'S
     COUNTERCLAIMS .........................................................................................................4

II.  ALL OF THE PATENTS ARE VALID...........................................................................9

III. THE STANDARD FOR PATENT ELIGIBILITY...........................................................9

IV.  THE '036 PATENT IS NOT INVALID UNDER § 101..................................................11

A.  The '036 Patent Is Not Invalid Based on the Court's Prior Decision ..............................11

B.  The '036 Patent Contains Patent-Eligible Subject Matter...............................................13

V.   THE CLAIMS OF THE '349, '769 AND '916 PATENTS ARE
     PATENT ELIGIBLE..........................................................................................................18

CONCLUSION.........................................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l.,*
134 S. Ct. 2347 (2014) ................................................................................*passim*

*Already, LLC, v. Nike, Inc.,*
133 S. Ct. 721 (2013) ........................................................................................4, 8

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.,*
133 S. Ct. 2107 (2013) ............................................................................ 10, 14, 15

*Benitec Australia Ltd. v. Nucleonics, Inc.,*
498 F.3d 1340 (Fed Cir. 2007)......................................................................6, 7, 9

*Chamberlain Grp., Inc. v. Linear LLC,*
No. 14-cv-05197, 2015 U.S. Dist. LEXIS 87876 (N.D. Ill. July 7, 2015).............................16

*DataTern, Inc. v. MicroStrategy, Inc.,*
No. 11-11970-FDS, 2015 U.S. Dist. LEXIS 118530 (D. Mass. Sep. 4, 2015) .................9, 16

*Diamond v. Diehr,*
101 S. Ct. 1048 (1981) ......................................................................... 10, 11, 17

*Dow Jones & Co. v. Ablaise Ltd.,*
606 F.3d 1338 (Fed. Cir. 2010)....................................................................5, 6, 8

*Esoterix Genetic Labs, LLC v. Qiagen, Inc.,*
No. 14-cv-13228-ADB, 2015 U.S. Dist. LEXIS 129310 (D. Mass. Sep. 25,
2015) ....................................................................................................... 11, 12, 18

*Field v. Mans,*
157 F.3d 35 (1st Cir. 1998)..................................................................................11

*Klaustech, Inc. v. Admob, Inc.,*
No. C 10-05899 JSW, 2015 U.S. Dist. LEXIS 118532 (N.D. Cal. Aug. 31,
2015).........................................................................................................................16

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
132 S. Ct. 1289 (2012) ................................................................................*passim*

*MedImmune, Inc. v. Genentech, Inc.,*
549 U.S. 118 (2007) .......................................................................................4, 7, 8

*Messaging Gateway Solutions, LLC v. Amdocs, Inc.,*
No. 14-732-RGA, 2015 U.S. Dist. LEXIS 49408 (D. Del. April 15, 2015) ..........................16

i

*Microsoft Corp. v. i4i Ltd. P'ship*,
   131 S. Ct. 2238 (2011) ..................................................................................9

*Ormco Corp. v. Align Tech., Inc.*,
   498 F.3d 1307 (Fed Cir. 2007)....................................................................12

*Streck, Inc. v. Research & Diagnostic Sys.*,
   665 F.3d 1269 (Fed. Cir. 2012)....................................................................8

*Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*,
   890 F. Supp. 2d 398 (S.D.N.Y. 2012) .........................................................5

*VideoShare, LLC. v. YouTube, LLC*,
   No. 12-12012-MLW, 2014 WL 458155 (D. Mass. Feb. 1, 2014) ............ 4, 5, 7, 17

*Walter & Shuffain, P.C. v. CPA Mut. Ins. Co. of Am. Risk Retention Grp.*,
   660 F. Supp. 2d 116 (D. Mass. 2009)..........................................................11

**Statutes**

28 U.S.C. § 2201(a) ............................................................................................4

35 U.S.C. § 101.........................................................................................*passim*

35 U.S.C. § 282...................................................................................................9

Massachusetts Unfair Trade Practices Act. ........................................................1

**Other Authorities**

2014 Interim Guidance on Patent Subject Matter Eligibility ("December
   Guidance"), 79 Fed. Reg. 74618 (Dec. 16, 2014)......................................19

Kris et. Al., "Efficacy of Gifitinib, an Inhibitor of the Epidermal Growth Factor
   Receptor Tyrosine Kinase, in Symptomatic Patients With Non-Small Cell
   Lung Cancer," JAMA, Vol. 290 No. 16 (2003)......................................18, 20

U.S. CONST art. 3..............................................................................................4

## INTRODUCTION

Plaintiff-Counterclaim Defendant Esoterix Genetic Laboratories LLC ("EGL") and Counterclaim-Defendant Laboratory Corporation of America Holdings (collectively, "LabCorp") submit this memorandum of law (1) in support of their cross-motion for judgment on the pleadings on Counts II-V of the counterclaims asserted by QIAGEN Manchester, Ltd. and QIAGEN Inc. (collectively, "QIAGEN"), and (2) in opposition to QIAGEN's motion for judgment on the pleadings on the same counterclaim counts.  This Court should grant LabCorp's cross-motion to dismiss the counterclaims and deny QIAGEN's motion because – especially in light of LabCorp's covenant not to sue – the Court does not have subject matter jurisdiction over the counterclaims.  Alternatively, QIAGEN's motion should be denied because the claims of the patents-in-suit should be held patent eligible under 35 U.S.C. § 101.

## STATEMENT OF FACTS

This action concerns QIAGEN'S breach of a License Agreement to manufacture and sell Test Kits utilizing discoveries protected by certain patents set forth in Schedule A to the License Agreement.  (Compl. ¶ 18.)  These patents include U.S. Patent Nos. 7,294,468 ("'468 patent"), 7,964,349 ("'349 patent"), 8,105,769 ("'769 patent"), 8,465,916 ("'916 patent"), and 9,035,036 ("'036 patent"), among other patent rights.  The License Agreement granted Qiagen N.V. the immediate right to sell epidermal growth factor receptor ("EGFR") Test Kits for non-commercial research purposes only, but sales for commercial research or diagnostic testing purposes were prohibited until regulatory approval was obtained, which did not happen until July 2013.  (Compl. ¶¶ 26-31, 38.)  A substantial number of pre-regulatory approval sales was made for commercial research or diagnostic testing purposes, thus breaching the License Agreement, breaching the implied covenant of good faith and fair dealing, and violating the Massachusetts Unfair Trade Practices Act.  (*Id.* at 36-38.)

A.    **The Covenant Not to Sue**

Following motion practice on the Amended Complaint, QIAGEN brought counterclaims

seeking a declaration that the '349 patent, '769 patent, '916 patent, and '036 patent ("the

Patents") are invalid under 35 U.S.C. § 101. LabCorp answered, *inter alia*, that there is no case

or controversy between the parties concerning the Patents, since EGL's claims concerned past

sales of the Test Kits for uses covered by the '468 patent and outside the scope of the License.

QIAGEN filed the current motion for judgment on the pleadings that the Patents are invalid

under Section 101. Shortly after that motion was filed, LabCorp gave QIAGEN a covenant not

to sue on the Patents. (*See* Ex. 2, Covenant Not to Sue.)[1]

The covenant not to sue states that, to clarify LabCorp's assertion that there is no case or

controversy over the Patents between the parties:

> …EGL and LabCorp hereby covenant that they will not sue, assert
> any claim or counterclaim against, or otherwise participate in any
> action or proceeding against, Qiagen claiming or otherwise
> asserting that sales of EGFR test kits for clinical diagnostic
> purposes or research purposes infringes any claim of the Patent[s]
> [sic], or cause or authorize any person or entity to do so, during the
> term of the License Agreement. This Covenant does not extend to
> assertions by EGL or LabCorp of their rights under the License
> Agreement, nor does it bar EGL or LabCorp from upholding the
> validity or enforceability of the Patents in response to a challenge
> to validity or enforceability by Qiagen.

(*Id.*)

The covenant removes any risk that LabCorp will sue QIAGEN for infringement of the

Patents, and thus eliminates any case or controversy that would support a counterclaim seeking a

declaratory judgment of invalidity of the Patents. It preserves LabCorp's contract rights, but

LabCorp's claims against Qiagen for sales in breach of contract are based on the License

---

[1] The Covenant Not to Sue is attached as Exhibit 2 to the Declaration of Christopher R. Howe, dated February 10, 2016 and filed herewith (the "Howe Declaration"). "Ex. __" refers to the exhibits attached to the Howe Declaration.

2

Agreement, not on the Patents.

**B.      The Patents at Issues**

The '349, '769, and '916 patents ("Method of Drug Treatment Patents") are similar to the '468 patent in that they concern inventions for improved lung cancer treatments through the administration of certain medications when certain gene mutations are present.  ('349 Patent (ECF No. 89-2) at 3:59-4:14; '769 Patent (ECF No. 89-3) at 3:59-4:14; '916 Patent (ECF No. 89-4) at 3:59-4:14).  The '036 patent concerns the invention of a diagnostic kit to determine the presence of certain EGFR gene mutations.  ('036 Patent (ECF No. 89-5) at 7:13-19.)

For example, the invention in claim 1 of the '036 patent is for a kit comprising

> a. at least one nucleic acid probe designed to detect a nucleotide
> variance within exons 18, 19, 20 or 21 of the EGFR gene, wherein
> detection is based on specific hybridization to the nucleotide
> variance sequence, wherein the nucleotide variance comprises [the
> identified substitutions or deletions in exons 18, 19, 20 or 21]; and
> wherein the nucleic acid probe comprises a detectable label; b.
> products and reagents required to carry out an annealing reaction;
> and c. instructions.

('036 Patent at 525:17-47.)

A probe with a detectable label, like the one claimed in the '036 patent, is not found in nature.  (Ex. 3, Eisenberg Dec. at ¶ 9.)  A nucleic acid probe is used for detecting a targeted nucleic acid sequence.  (*Id.* at ¶ 3.)  A probe is generally a short (less than 100 nucleotides) sequence of nucleic acids that has a base sequence complementary to the nucleic acid sequence of interest.  (*Id.* at ¶ 5.)  A nucleic acid probe with a detectable label is one where a label has been added to one of the nucleotides on the probe so that binding (hybridization) of the probe to the targeted nucleic acid sequence can be detected.  (*Id.* at ¶ 6.)

Probes with detectable labels are not found in nature.  (*Id.* at ¶ 9.)  Rather, such a probe is created in a laboratory to detect a specific nucleic acid sequence, like a gene mutation.  (*Id.*)  The

3

processes to attach a detectable label to the probe also do not occur in nature but are done in a laboratory. (*Id.*) The methods include chemical steps to label the probe nucleotides by incorporation of nucleotide analogs that contain the label. (*Id.*) For example, a "fluorophore group," which includes a fluorescent chemical compound capable of detection, can be attached to a probe to allow for detection of the targeted sequence. (*Id.* at ¶ 7; *see also* '036 Patent at 12:59-67.)

## ARGUMENT

### I.     THE COURT LACKS SUBJECT MATTER JURISDICTION OVER QIAGEN'S COUNTERCLAIMS

QIAGEN's counterclaims must be dismissed because the Court lacks subject matter jurisdiction. Under Article III of the Constitution, federal courts have jurisdiction only to hear an actual case or controversy. U.S. CONST. art. 3. The Declaratory Judgment Act did not change that standard; it also requires an "actual controversy." 28 U.S.C. § 2201(a). In the absence of a case or controversy, a court lacks subject matter jurisdiction to hear a dispute and "'the only function remaining to the court is that of announcing the fact and dismissing the cause.'" *VideoShare, LLC. v. YouTube, LLC*, 2014 WL 458155, at *3 (D. Mass. Feb. 1, 2014) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)).

The Declaratory Judgment Act allows a party to seek a declaration concerning another's intellectual property rights before taking action which may expose it to liability, such as breaching a license agreement. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 137 (2007). But an "actual controversy" is still required. The "actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC, v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013) (quoting *Alvarez v. Smith*, 558 U.S. 87, 92 (2009) and *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)) (internal quotation marks omitted). *See also*

*Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*, 890 F. Supp. 2d 398, 404 (S.D.N.Y. 2012). "Subject matter jurisdiction in a declaratory judgment suit depends upon the existence of 'a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1345 (Fed. Cir. 2010) (quoting *MedImmune*, 549 U.S. at 127). "Consequently, the Federal Circuit has 'held, in a line of cases … that a covenant not to sue for patent infringement divests the trial court of subject matter jurisdiction over claims that the patent is invalid, because the covenant eliminates any case or controversy between the parties.'" *VideoShare*, 2014 WL 458155, at *2 (quoting *Dow Jones*, 606 F.3d at 1346).

Under this line of cases, the covenant not to sue granted to QIAGEN by EGL deprives the Court of jurisdiction over QIAGEN's counterclaims concerning the validity of the patents which are the subject of the covenant. (*See* Ex. 2, Covenant Not to Sue.) EGL's original complaint claimed infringement of the '468 patent by QIAGEN's sales of Test Kits outside the scope of the license, in addition to its claims for breach of contract and related non-patent causes of action based on the same conduct. (Compl. ¶¶ 42-88.) In its counterclaims, QIAGEN chose to seek a declaratory judgment of invalidity concerning four other patents, to prevent EGL from asserting those patents against it in the future. (Answer ¶¶ 42-60.) Where it is QIAGEN and not EGL which brought these additional patents into the litigation, EGL's promise not to sue for infringement reinforces the principle that the covenant "extinguished any current or future case or controversy between the parties, and divested the district court of subject matter jurisdiction." *Dow Jones*, 606 F.3d at 1348.

Whether a covenant not to sue eliminates any live case or controversy, thereby divesting the court of jurisdiction, depends on the scope of the covenant. Possible future litigation cannot

create a case or controversy that does not exist at present.  *See, e.g., Benitec Australia Ltd. v. Nucleonics, Inc.,* 498 F.3d 1340, 1346–48 (Fed Cir. 2007).  EGL has not asserted the Patents against QIAGEN for sales of its Test Kits.  EGL has not based its breach of contract claims for past damages on the Patents.  QIAGEN concerns about future conduct cannot support subject matter jurisdiction in the present.

In *Dow Jones*, Ablaise accused Dow Jones of infringing two patents covering methods of generating computer web pages. 606 F.3d at 1344.  Dow Jones responded by seeking a declaratory judgment that the patents were invalid and not infringed.  *Id.*  Following an adverse *Markman* ruling, Ablaise offered a covenant not to sue on one of the patents.  *Id.*  The Federal Circuit held that the offer of the covenant not to sue divested the district court of subject matter jurisdiction over the covered patent.  *Id.* at 1348.  The facts that the patent had been asserted in at least nine other actions, that the two patents were closely related, or that Ablaise was trying to avoid the consequences of an adverse *Markman* ruling, were insufficient.  *Id.* at 1347–48.

Similarly, in *Benitec*, the Federal Circuit held that a covenant not to sue need not encompass potentially infringing future activity, so long as it covered the past and present activities that constituted the actual controversy between the parties.  498 F.3d at 1346–48. Benitec sued Nucleonics for infringing a gene silencing patent, a method of treating certain diseases.  *Id.* at 1342.  Benitec provided Nucleonics with a covenant not to sue for patent infringement for conduct occurring before the date of the dismissal.  *Id.* at 1343.  The Federal Circuit held that "[u]nder these circumstances, there is no controversy between the parties concerning infringement by Nucleonics…."  *Id.* at 1348.  Nucleonic's arguments that it intended to submit an NDA in the future for similar technology and that it needed to remove any concerns potential investors might have over possible future infringement claims, were insufficient.  *Id.* at

1346. These concerns about the future did not create a current substantial controversy "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 1349 (quoting *MedImmune*, 549 U.S. at 127).

In *Fortinet Inc. v. Trend Micro Inc.*, Fortinet brought a declaratory judgment action that it had no contractual obligation to pay royalties under a license because of the invalidity of the underlying patents. 2009 WL 1814598, at *1 (N.D. Ca. June 24, 2009). Trend Micro covenanted not to sue Fortinet for infringement of the patents. *Id.* The court agreed that this eliminated the case or controversy and rejected Fortinet's argument that the threat of a breach of contract action if it stopped paying royalties provided the requisite case or controversy, because the invalidity of the patent would be merely an element of the defense to the contract action, should it be brought.[2] *Id.* at *3. *See also VideoShare*, 2014 WL 458155, at *2–4 (covenant not to sue by plaintiff is basis for dismissal of plaintiff's complaint for infringement and also defendant's counterclaim of invalidity, since it "extinguishes the controversy between the parties and, therefore, divests the court of jurisdiction"; existence of controversy involving related continuation patents does not change this analysis).

The Supreme Court decision in *MedImmune* does not require a contrary result. *MedImmune* held that a licensee had standing to bring suit challenging the license, and the underlying patents, without first breaching the license. 549 U.S. at 137. There was no covenant not to sue at issue in *MedImmune*.[3] The question was whether a contract must be breached

_____

[2] The *Fortinet* court held that it would not have jurisdiction over the prospective breach of contract action, since an action for royalties is not brought under the patent laws and does not provide federal jurisdiction. In the instant case, the federal jurisdiction over the non-patent claims is based on diversity jurisdiction. The principle still holds, however, that the covenant not to sue extinguishes the controversy, and the question of patent validity would be raised only as part of a defense to a breach of contract action which, in the instant case, has not been brought.

[3] During the remand to the district court, the patent holder did give a covenant not to sue for all but one claim of the patent. As a result, the district court held that subject matter jurisdiction was extinguished for

before it can be attacked by declaratory judgment; a subsidiary question was whether a reasonable apprehension that a lawsuit was imminent was required for declaratory judgment jurisdiction, as Federal Circuit precedence had required. *Id.* at 121–22. As the Federal Circuit has noted, "*MedImmune* does not stand for the proposition that an Article III case or controversy exists automatically whenever a competitor desires to mount a validity challenge." *Streck, Inc. v. Research & Diagnostic Sys.*, 665 F.3d 1269, 1284 (Fed. Cir. 2012).

In *Already*, the Supreme Court reviewed a situation where a covenant not to sue had been given. 133 S. Ct. at 725. Nike sued Already for infringing its trademark; Already counterclaimed that the trademark was invalid. *Id.* Nike then unilaterally issued a covenant not to sue on trademark or unfair competition claims for the existing footwear designs or colorable imitations,[4] and moved to dismiss Already's invalidity counterclaim. *Id.* The Supreme Court agreed that the covenant extinguished the cause of action, since it encompassed all of Nike's allegedly wrongful conduct. *Id.* at 728.

Even limited covenants extinguish jurisdiction if they encompass the current controversy between the parties. *See, e.g., Dow Jones*, 606 F.3d at 1344 (no case or controversy where covenant excluded parent company but covered existing dispute between the parties); *Organic Seed Growers*, 718 F.3d at 1360 (no case or controversy where covenant limited to growers or sellers of trace amounts of genetically modified seeds that blew onto their property, where no indication that declaratory judgment plaintiffs intended to use or sell greater than trace amounts

---

all other claims and dismissed the invalidity declaratory judgment actions attacking the other claims. The court refused to dismiss or grant summary judgment on the contract causes of action based on the remaining claim, however. Several months after this decision, it was announced that the parties had settled the litigation. http://www.gene.com/media/press-releases/11327/2008-06-11/genentech-settles-dispute-related-to-cab.

[4] Nike's stated reason was that Already's actions were no longer at a level that warranted "the substantial time and expense of continued litigation," not that it had any doubt about the validity of its trademark or the impropriety of Already's conduct. 133 S. Ct. at 725.

and despite "chilling effect" of patent holder refusal to grant broader covenant).

EGL and LabCorp have promised that they "will not sue, assert any claim or counterclaim against, or otherwise participate in any action or proceeding against, Qiagen claiming or otherwise asserting that sales of EGFR test kits for clinical diagnostic purposes or research purposes infringes any claim of the Patent[s] [sic]." (Ex. 2, Covenant Not to Sue.) Thus, "there is no controversy between the parties concerning infringement by" Qiagen in its sales of Test Kits. *Benitec*, 495 F.3d at 1348. As a result, this Court does not have subject matter jurisdiction over the declaratory judgment counterclaims, and they must be dismissed.

## II.    ALL OF THE PATENTS ARE VALID

If the Court does reach the merits, QIAGEN's motion for judgment on the pleadings should be denied. There are significant differences between this Court's ruling dismissing EGL's claim for infringement of the '468 patent on the one hand, and the patents at issue in the counterclaims, especially the '036 patent claiming a test kit.[5]

Under 35 U.S.C. § 282, "[a] patent shall be presumed valid" and QIAGEN has the burden of establishing invalidity of the Patents by "clear and convincing evidence." 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011); *DataTern, Inc. v. MicroStrategy, Inc.*, 2015 U.S. Dist. LEXIS 118530, at *24–25 (D. Mass. Sep. 4, 2015) (applying standard to a § 101 defense). QIAGEN fails to meet this burden.

## III.   THE STANDARD FOR PATENT ELIGIBILITY

Section 101 of the Patent Act defines patent-eligible subject matter to include "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof[.]" 35 U.S.C. § 101. The Supreme Court recognizes three categories of

---

[5] Although the discussion of the law may be quite similar to EGL's briefing on the previous motion to dismiss, there are significant differences based on the differences between the patents, and we believe that the law's application to the facts of the patents now at issue requires a different outcome.

exceptions to patent eligible material under section 101: "laws of nature, natural phenomena,

and abstract ideas." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1300

(2012). "The rule against patents on naturally occurring things is not without limits, however,

for 'all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural

phenomena, or abstract ideas,' and 'too broad an interpretation of this exclusionary principle

could eviscerate patent law.'" *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S.

Ct. 2107, 2116 (2013) (quoting *Mayo Collaborative Servs.*, 132 S. Ct. at 1293). *See also Alice*

*Corp. Pty. Ltd. v. CLS Bank Int'l.*, 134 S. Ct. 2347, 2354 (2014).

Applications of patent ineligible concepts are patent eligible. *Mayo*, 132 S. Ct. at 1293–

94. For example, while some genes and some gene fragments, if naturally occurring, may not be

patent eligible, "*applications* of knowledge" of the genes can be patented. *Myriad Genetics*, 133

S. Ct. at 2120 (emphasis in original). Synthetically created or altered DNA is also patent eligible

because it is not a product of nature. *Id.* at 2119.

As the Supreme Court held thirty years earlier:

> It is now commonplace that an *application* of a law of nature or mathematical
> formula to a known structure or process may well be deserving of patent
> protection. As Justice Stone explained four decades ago: "While a scientific
> truth, or the mathematical expression of it, is not a patentable invention, a novel
> and useful structure created with the aid of knowledge of scientific truth may be."

*Diamond v. Diehr,* 101 S. Ct. 1048, 1057 (1981) (emphasis in original) (citations omitted)

(quoting *Mackay Radio & Telegraph Co. v. Radio of America*, 59 S. Ct. 427, 431 (1939)).

In *Alice Corp.*, the Supreme Court established a two-step framework: (1) whether the

claims are directed to a patent-ineligible concept; and if so, (2) whether the remaining elements

of the claims transform the nature of the claims into patent eligible applications, *i.e.*, whether the

claims contain an "inventive concept." 134 S. Ct. at 2355.

A new technology is not required for an "inventive concept." Rather, claims that

10

incorporate patent ineligible matter, like a mathematical equation, also are patent eligible if they improve an existing technological process.  As the Court stated:  "In *Diehr*…[t]he claim employed a 'well-known' mathematical equation, but it used that equation in a process designed to solve a technological problem in 'conventional industry practice.'"  *Alice Corp.*, 134 S. Ct. at 2358 (quoting *Diehr*, 101 S. Ct. at 1048).  Additionally, an "inventive concept" can result from the integration of a patent ineligible concept into a process that does not seek to pre-empt the use of the patent ineligible concept.  *Diehr*, 101 S. Ct. at 1057.

The claims of the Patents are not directed to patent ineligible concepts, and to the extent they are, each contains an "inventive concept."

## IV.   THE '036 PATENT IS NOT INVALID UNDER § 101

### A.   The '036 Patent Is Not Invalid Based on the Court's Prior Decision

QIAGEN is wrong that this Court's decision on the '468 patent and/or the law of the case doctrine control the outcome of the validity of the '036 patent.  For the law of the case doctrine to apply, an issue must have been "actually considered and decided" or "necessarily inferred from the disposition."  *Field v. Mans*, 157 F.3d 35 (1st Cir. 1998) (quoting *Commercial Union Ins. Co. v. Walbrook Ins. Co., Ltd.*, 41 F.3d 764, 770 (1st Cir. 1994)); *Walter & Shuffain, P.C. v. CPA Mut. Ins. Co. of Am. Risk Retention Grp.*, 660 F. Supp. 2d 116, 125 (D. Mass. 2009).  The claims of the '036 patent are substantively different from the '468 patent, and thus, the issue of their validity has not yet been "considered and decided."

In this Court's September 25, 2015 decision on the '468 patent, the Court considered method of use claims which required a method of treating non-small cell lung cancer with the man-made tyrosine kinase inhibitor drugs, gefitinib and erlotinib, when certain nucleotide variances are present in the EGFR gene.  *See Esoterix Genetic Labs, LLC v. Qiagen, Inc.*, 2015 U.S. Dist. LEXIS 129310 (D. Mass. Sep. 25, 2015) ("*Qiagen I*"), at *6–9, 23–29.  The Court

11

held:  (1) the claims of the '468 patent were directed to a law of nature because they describe "the correlation between a naturally-occurring mutation in a cancer cell, and the likelihood that a particular type of known pharmaceutical compound will be effective in treating that type of cancer"; and (2) "the method claimed in the '468 Patent does not fundamentally transform, or even alter, a known method of treating these cancers."  *Qiagen I*, at \*23, \*25.

By contrast, the claims of the '036 patent are not directed to a law of nature.  The claims of the '036 patent are also not directed to a method of treatment and do not recite the use of any drugs.  ('036 Patent at 525:17-528:43.)  Instead, the claims are for an apparatus – a diagnostic kit – used to detect nucleotide variances with a nucleic acid probe that includes a detectable label.  (*Id.*)  The claimed probes contain fragments of DNA with laboratory-added labels, which are complementary to the sequences to be detected such that the probe hybridizes to the target by allowing base pairing.  (Ex. 3, Eisenberg Dec. at ¶ 5.)  Such nucleic acid probes comprising a detectable label are not found in nature; the detectable label is artificially attached to the probe in a laboratory.[6]  (*Id.* at ¶ 9.)

Qiagen's reliance on *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307 (Fed Cir. 2007), is misplaced.  (QIAGEN Mem. at 4.)  In *Ormco*, the law of the case doctrine applied to claims that were either identical or virtually identical, *i.e.*, the term "method" replaced the term "system" in the claims previously adjudicated.  498 F.3d at 1320.  Here, as explained above, the claims of the '036 patent do not merely change a few words from the '468 patent.  The '468 patent is directed to a new and improved method of treating non-small cell lung cancer with man-made drugs and the '036 patent is directed to a diagnostic kit.

QIAGEN's reliance on *Exergen Corp. v. Kaz USA, Inc.* is also misplaced because this

---

[6] To the extent that QIAGEN argues that there could exist in nature a nucleic acid probe with a detectable label, the term "detectable label," as properly construed in the patent, would exclude such a probe.

case actually supports LabCorp's position.  (QIAGEN Mem. at 4.)  In *Exergen*, the court held

that the doctrine of issue preclusion did not apply to claims with substantive differences, and

further found that certain claims were patent eligible.  2015 WL 8082402 (D. Mass. Dec. 7,

2015).  In particular, the court held that claims requiring the measuring of and detecting of body

temperature with certain techniques were patent eligible.  *Exergen Corp.*, 2015 *Id.* at *7–8.

### B.   The '036 Patent Contains Patent-Eligible Subject Matter

QIAGEN's argument that the claims of the '036 patent are invalid because they are

"directed to a natural law" mischaracterizes the invention and misapplies the law. (QIAGEN

Mem. at 10.)  Notably, the '036 patent was prosecuted, and the U.S. Patent and Trademark

Office ("PTO") issued the patent, after the Supreme Court's decisions in *Alice* and *Mayo*.  The

PTO considered the patent's eligibility under 35 U.S.C. § 101 as recently interpreted and

nevertheless allowed the claims.  This Court similarly should find the claims patent eligible.

In considering patent eligibility, the PTO Examiner did not find the natural law patent

eligibility exception applicable.  For example, one of the proposed claims was as follows: "1. A

kit comprising: a. at least one nucleic acid probe designed to detect a nucleotide variance within

exons 18, 19, 20 or 21 of the EGFR gene, wherein detection is based on specific hybridization to

the nucleotide variance sequence; b. products and reagents required to carry out an annealing

reaction; and c. instructions." (Ex. 17, Claim at claim 1.)  During prosecution of the patent, the

Examiner initially found the claim patent ineligible and issued a Non-Final Rejection dated

March 24, 2014 because it was directed to a "product of nature." (*See* Ex. 9, Non-Final

Rejection at 4-6.)  The Examiner stated: "Although the probes [in the claims] are fragments of

mutant EGFR sequences that occur in nature, breaking the bonds between DNA to form probes

is not considered sufficient to make the probes structurally significantly different from what

occurs in nature." (*Id.* at 4-5.)

A patent applicant is permitted to respond to a Non-Final Rejection by explaining why the claim should not be rejected and/or amending the claim. In response, on September 23, 2014, the Applicants amended the claims, which, *inter alia*, added a claim limitation regarding the probe as follows: "wherein the nucleic acid probe comprises a detectable label." (Ex. 10, Applicant's Response at 2.) The Applicants explained: "Although Applicants do not agree that the probes are a product of nature, in an effort solely to expedite prosecution and allowance of a preferred embodiment, claims 1 and 9 have been amended to specifically recite that the nucleic acid probes recited therein comprise a detectable label." (*Id.* at 8.) Subsequently, on December 5, 2014, the Examiner accepted the Applicants' explanation and agreed that, based on the amendment, the claim was no longer patent ineligible as a product of nature. The Examiner indicated agreement with the Applicants by issuing a Notice of Allowance, which permits the patent to be issued. (Ex. 11.)

QIAGEN agreed with this position in arguments to the PTO when it was attempting to obtain a patent covering its own EGFR gene test kit, taking the opposite position from its argument in this Court that a kit directed to detecting the presence of EGFR mutations is not patent eligible. QIAGEN's patent, issued as U.S. Patent No. 9,029,084 (the "'084 patent"), includes claims for primer sequences (*i.e.*, nucleic acid sequences) used to detect EGFR mutations and kits that include polynucleotides with a fluorophore, *i.e.*, a detectable label. (Ex. 1, '084 patent; *see, e.g.*, claims 1, 7-9.)

The '084 patent was issued on May 12, 2015 – after *Mayo* and *Alice* – and the PTO specifically addressed patent eligibility. The Examiner first rejected QIAGEN's primer and kit claims in light of the Supreme Court's decision in *Myriad*, stating: "Here, the claimed kit is directed to naturally-occurring EGFR sequences." (Ex. 12, Non-Final Rejection at 2-4; Ex. 14,

14

Final Rejection at 3) (emphasis in original).)  Like the applicant of the '036 patent, QIAGEN

added a claim limitation concerning a detectable label, *i.e.*, a fluorophore group.  (Ex. 13,

Amendment at 2; Ex. 15, Response at 3; Ex. 3, Eisenberg Dec. at ¶ 7.)  In its remarks to the

patent examiner, QIAGEN argued that the additions to the claims overcame the § 101 rejection.

(Ex. 13, Amendment at 2.)  The Examiner accepted QIAGEN's argument and allowed the

claims.  (*See* Ex. 16, Notice of Allowance.)  In other words, QIAGEN's position in the PTO was

the same as LabCorp's position before this Court.  Just as QIAGEN argued to the PTO, this

Court should find that a kit comprising a probe with a detectable label used to detect EGFR gene

mutations is not a product of nature, and thus, patent eligible.

QIAGEN's argument that the '036 claims are patent ineligible is based not on the claims

as written, but on its misstatement that the claims are directed to a natural law by disregarding

the kit actually claimed in the '036 patent.  These claims are not directed to a law of nature, and

the detectable label added to the nucleic acid probes confirms that the claims are not directed to a

product of nature.  Even if the nucleic acid probe were naturally occurring – which LabCorp

does not concede – the detectable label transforms it into something that does not exist in nature.

The claims of the '036 patent are, therefore, directed to products that do **not** occur in nature, and

accordingly, the Court should find the claims patent eligible under step one of the *Alice* test.  *See*

*Myriad Genetics*, 133 S. Ct. at 2119 (non-naturally occurring cDNA is patent eligible).

To the extent the Court finds that the claims are directed to natural phenomena, they

continue to be patent eligible because they contain an inventive concept under step two of the

*Alice* test.  In *Mimedx Group v. Nutech Med., Inc.*, for example, the court evaluated claims that

incorporated placental tissue – a natural phenomenon.  2015 U.S. Dist. LEXIS 158867 (N.D.

Ala. Nov. 24, 2015).  The claims of one of the patents at issue required placing an "asymmetric

label" on a tissue graft for the purpose of "permitting direct, visual determination of the

orientation" of the placental tissue graft. *Id.* at *16–17. The court held that, although the

placental tissue is a "natural phenomenon," the claims set forth a novel and useful process

because "adding an asymmetrical label ... causes the placental tissue to be physically

'transformed' from such tissue as it exists in nature." *Id.* at *17. Similarly, the court found that

certain claims in another patent-in-suit requiring natural-occurring layers of tissue graft to be

"directly adhered to each other ... 'transforms' the naturally occurring tissue into a patent-

eligible invention." *Id.* at *19.

     Likewise, as the PTO found, the "detectable label" transformed the fragments of DNA

sequences claimed in the '036 patent into an artificially created product that does not occur in

nature, and thus a patent-eligible invention. (*See* Exs. 9-11.) Other courts also have found that

the application of a patent ineligible concept, like an abstract idea, can be transformed into a

patentable invention. *See DataTern, Inc. v. MicroStrategy, Inc.*, 2015 U.S. Dist. LEXIS 118530,

at *26 (D. Mass. Sep. 4, 2015) ("[T]he '502 patent is directed at solving a problem that

specifically arises in the realm of computing; indeed, object-oriented programs exist only in the

realm of computers, and relational databases are utilized primarily, if not exclusively, on

computers. "); *Messaging Gateway Solutions, LLC v. Amdocs, Inc.*, 2015 U.S. Dist. LEXIS

49408, at *17 (D. Del. April 15, 2015) ("[The invention] is firmly rooted in technology and is

addressed to a specific problem arising in the realm of mobile device-to-Internet

communication."); *Klaustech, Inc. v. Admob, Inc.*, 2015 U.S. Dist. LEXIS 118532, at *8 (N.D.

Cal. Aug. 31, 2015) (holding the claims patent eligible under § 101 because the patent "addresses

a technological improvement specific to Internet-related advertising"). For example, in

*Chamberlain Grp., Inc. v. Linear LLC*, 2015 U.S. Dist. LEXIS 87876, at *16–29 (N.D. Ill. July

7, 2015), the Court held that adding physical components to an abstract idea concerning an alarm

system, like a garage door controller, satisfied the "inventive concept" step.

In *DDR Holdings, LLC v. Hotels.com, L.P.*, the Federal Circuit held that claims directed

to a website that "1) incorporates 'look and feel' elements from the host website, and 2) provides

visitors with the opportunity to purchase products from the third-party merchant without actually

entering that merchant's website" were not patent ineligible abstract ideas.  773 F.3d 1245, 1258

(Fed. Cir. 2014).  The Court explained that "the claimed solution is necessarily rooted in

computer technology in order to overcome a problem specifically arising in the realm of

computer networks."  *Id.* at 1257.  In applying *DDR*, the court in *Ameritox, Ltd. v. Millennium*

*Health, LLC* stated:  "While the invention at issue in *DDR* was in the software field, that decision

establishes that inventive concept can be established by something more than 'conventional

functioning' that targets and improves existing technological processes for a specific problem in

field of the invention."  88 F. Supp. 3d 885, 912 (W.D. Wis. 2015), reconsideration denied, No.

13-CV-832-WMC, 2015 WL 1272280 (W.D. Wis. Mar. 19, 2015), summary judgment granted

in favor of plaintiff in 2015 WL 1915043 (Apr. 24, 2015) (finding claims patent eligible).

Similarly, the court in *Ameritox* explained that *Diehr* is applicable to other types of

inventions that improve a pre-existing technology:

> Specifically, like the rubber curing improvements taught in the
> *Diehr* patent, new improvements are similarly taught in the '680
> patent (albeit with respect to drug compliance monitoring).
> Indeed, each additional step taught directs the skilled addressee to
> an invention that allows quantifiable analysis of urine samples to
> determine a patient's compliance with a prescribed drug regimen.
> This type of improvement in existing technology is the type of
> invention that the statute seeks to encourage, not dismiss.

*Id.* at 912.  In applying *Diehr* and *DDR*, as the court did in *Ameritox*, this Court should find that

the patented kit of the '036 patent is patent eligible because it is a technological improvement to

a diagnostic kit to solve the problem relating to detecting certain gene mutations in connection with lung cancer treatment.

In sum, the claims of the '036 patent are patent eligible because they are not directed to any patent ineligible concept under step one of the *Alice* test. The probes with detectable labels are not products of nature, as QIAGEN itself asserted in the PTO. Even if the Court finds that the claims are directed to a product of nature, under step two of the *Alice* test, the claims provide an inventive concept because the alleged product of nature is transformed by the addition of the detectable label and the kit represents a technological improvement.

## V.   THE CLAIMS OF THE '349, '769 AND '916 PATENTS ARE PATENT ELIGIBLE

Like the '468 patent, the '349, '769, and '916 patents teach new and improved methods for treating lung cancer with tyrosine kinase inhibitors, including the drugs gefitinib and erlotinib, by determining the increased likelihood that the drug treatments will be effective by determining the presence or absence of certain nucleotide variances in the EGFR gene. ('349 Patent at 3:57-4:14; '769 Patent at 3:57-4:14; '916 Patent at 3:57-4:14). LabCorp acknowledges that, based on this Court's decision in *Qiagen I*, the Court will likely hold the claims of these patents to be patent ineligible. LabCorp respectfully disagrees with the Court's decision in *Qiagen I* and incorporates its arguments in its opposition and sur-reply briefs and declarations filed in connection with *Qiagen I*. (*See* Exs. 4-7.) For the avoidance of doubt, these arguments are incorporated herein to preserve them for appeal and are briefly summarized below.

Prior to the invention in the Method of Drug Treatment Patents, conventional cancer treatments using tyrosine kinase inhibitors, like gefitinib and erlotinib, were administered in a non-targeted manner and had a low effectiveness rate. ('349 Patent at 3:36-45; '769 Patent at 3:36-45; '916 Patent at 3:36-45; *see also* Ex. 8, *Kris* at 2156). The inventors of the Method of Drug Treatment Patents made the surprising discovery that certain man-made tyrosine kinase

18

inhibitor drugs, such as gefitinib and erlotinib, are significantly more likely to be effective when certain nucleotide variances are present in the EGFR gene. ('349 Patent at 3:59-63; '769 Patent at 3:59-63; '916 Patent at 3:59-63.)   The Method of Drug Treatment Patents teach administration of tyrosine kinase inhibitor drugs when these variances are present.  ('349 Patent at 6:61-7:3; '769 Patent at 6:61-7:3; '916 Patent at 6:61-7:3.)

Under Step 1 of *Alice*, the court should hold that the claims of the Method of Drug Treatment Patents are patent eligible.  It is not enough that the claims "involve" a law of nature; the claims must be "directed" to a law of nature.  *See* 79 Fed. Reg. 74618, 74619 n.2, 74621 (Dec. 16, 2014); *accord Alice Corp.*, 134 S.Ct. at 2355.  The claims of the Method of Drug Treatment Patents are focused on treating the "particular disease" lung cancer, and thus, are patent eligible because the claims are not "directed" to a natural law.  *See* 2014 Interim Guidance on Patent Subject Matter Eligibility ("December Guidance"), 79 Fed. Reg. 74618 (Dec. 16, 2014); Nature-Based Product Examples published by the PTO to be used in conjunction with the December Guidance, Example 3, Claim 7, at 5.

Assuming the claims can be characterized as "directed" to a "law of nature," under step two of *Alice*, the claims are patent eligible because they contain an "inventive concept."  The patents teach the "inventive concept" of using the presence of EGFR gene mutations to treat patients with non-small cell lung cancer effectively with tyrosine kinase inhibitors, like gefitinib and erlotinib, and can further help inform patients who will not be receptive to the drug treatments to avoid ineffective treatments and unnecessary risks.  This was a new method of treatment and approach that differed substantially from the existing treatments.

Key differences in the facts of *Mayo* make the holding inapplicable to this case.  In *Mayo*, the Court found that the "determining" step "tells doctors to engage in well-understood, routine,

conventional activity previously engaged in by scientists who work in the field." 132 S. Ct. at 1298. By contrast, scientists neither tested for the nucleotide variances identified in the claims of the Method of Drug Treatment Patents, nor did they know that a relationship between the nucleotide variances and the tyrosine kinase inhibitor drugs even existed. ('349 Patent at 3:36-45; '769 Patent at 3:36-45; '916 Patent at 3:36-45.) Thus, it was not routine or conventional to administer these drugs only when those nucleotide variances were present. (*See id.*; Ex. 8, *Kris* at 2156.) Indeed, conventional treatments included: chemotherapy and EGFR tyrosine kinase inhibitors with only a 10-15% effectiveness rate. ('349 Patent at 1:64-2:2, 3:36-45; '769 Patent at 1:64-2:2, 3:36-45; '916 Patent at 1:64-2:2, 3:36-45.)

Therefore, the methods of treatment are new and improved methods of treating lung cancer and are deserving of patent protection.

## CONCLUSION

For the foregoing reasons, LabCorp respectfully requests that this Court grant its motion to dismiss counts II-V of the counterclaims for lack of subject matter jurisdiction, and deny QIAGEN's motion for judgment on the pleadings for the same counts.

February 10, 2016                          Respectfully submitted,

                                           **ESOTERIX GENETIC LABORATORIES LLC
                                           AND LABORATORY CORPORATION OF
                                           AMERICA HOLDINGS**

                                           By its Attorneys,
                                           **Campbell Edwards & Conroy
                                           Professional Corporation**

                                           */s/ Christopher R. Howe*
                                           James M. Campbell (#541882)
                                           jmcampbell@campbell-trial-lawyers.com
                                           Christopher R. Howe (#652445)
                                           chowe@campbell-trial-lawyers.com
                                           One Constitution Plaza

Boston, MA 02129
Tel: (617) 241-3000
Fax: (617) 241-5115

**Kelley Drye & Warren LLP**
Robert I. Steiner (*pro hac vice*)
rsteiner@kelleydrye.com
Beth D. Jacob (*pro hac vice*)
bjacob@kelleydrye.com
Clifford Katz (*pro hac vice*)
ckatz@kelleydrye.com
Jaclyn M. Metzinger (*pro hac vice*)
jmetzinger@kelleydrye.com
101 Park Avenue
New York, New York 10178
Tel: (212) 808-7800
Fax: (212) 808-7897

**Certificate of Service**

I hereby certify that on February 10, 2016 I caused to be served a copy of the foregoing to all counsel of record via the Court's ECF System.

/s/ Christopher R. Howe
Christopher R. Howe